Steven Wieland, ISB No. 8282
steven.wieland.service@mooneywieland.com
Mooney Wieland PLLC
802 W. Bannock St., Ste 500
Boise, ID 83702
t: 208.401.9219
f: 208.401.9218

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **David Powell**, an individual; and **Merav Knafo**, an individual,<br><br>     Plaintiffs,<br><br>vs.<br><br>**Crypto Traders Management, LLC**, a dissolved Idaho limited liability company; **Shawn Cutting**, an individual; and **Courtney Lata**, an individual,<br><br>     Defendants. | Case No. _____<br><br>**Verified Complaint**<br><br>Jury Trial Demanded |

Plaintiffs, by and through their attorneys, Mooney Wieland PLLC, for their Verified Complaint against Defendants, allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.  This is a suit by investors in a cryptocurrency investment fund against the fund and its managers for defrauding investors. Defendants conned Plaintiffs into depositing money

by assuring them their investments were growing in value and could be withdrawn at any time when in fact investments were simply being stolen or lost.

2.      Plaintiff David Powell seeks $609,724.27 in damages, plus pre-judgment interest accruing at $87.59 per diem as of 7/10/20, and post-judgment interest accruing at the statutory rate.

3.      Plaintiff Merav Knafo seeks $122,797.10 in damages, plus pre-judgment interest accruing at $17.64 per diem as of 7/10/20, and post-judgment interest accruing at the statutory rate.

## JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is an action arising under the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "**Securities Act**"). Subject-matter jurisdiction under the Securities Act is further founded under 15 U.S.C. § 77v(a).

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is also an action rising under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* (the "**Exchange Act**"). Subject-matter jurisdiction under the Exchange Act is further founded under 15 U.S.C. § 78aa(a).

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the suit is between Plaintiffs, who are citizens of Utah and Hawaii, and Defendants, who are all citizens of Idaho.

## VENUE

7.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because all

Defendants reside in, or are principally located in, the state of Idaho and because a substantial

part of the events or omissions giving rise to the claim occurred in this state.

8.      Venue is also proper pursuant to the Securities Act, 15 U.S.C. § 77v(a), and

the Exchange Act, 15 U.S.C. § 78aa(a), because all Defendants reside in and transact or

transacted business in this district.

## PARTIES

9.      Plaintiff David Powell is an individual who resides in West Jordan, Utah.

10.     Plaintiff Merav Knafo is an individual who resides in Pahoa, Hawaii.

11.     Defendant Crypto Traders Management, LLC, is a limited liability company

formed under the laws of Idaho, formerly with a principal place of business located in Bonner

County, Idaho ("**CTM**"). CTM was administratively dissolved effective May 15, 2019, and

has not been reinstated. On information and belief, it is believed that Defendant Shawn

Cutting was the sole member/manager of CTM. CTM is not, and never has been, a registered

broker-dealer under state or federal law.

12.     Defendant Shawn Cutting is an individual who resides in Blanchard, Bonner

County, Idaho. Cutting is not, and never has been, a registered broker-dealer under state or

federal law. Cutting is a career conman with multiple convictions for theft, bank fraud, and

forgery going back at least to the 1990s.

13.     Defendant Courtney Lata is an individual who resides in Coeur d'Alene, Kootenai County, Idaho. Lata is Cutting's daughter and is formerly known as Courtney Cutting. Lata is not, and never has been, a registered broker-dealer under state or federal law.

14.     Defendants Cutting and Lata, in conducting the investment enterprise described herein, have referred to themselves as "CTM" or "CTC."

## FACTS

15.     In recent years, popular interest in digital assets has skyrocketed worldwide. Often called "cryptocurrencies," there are now numerous digital assets based on blockchain technology, which allows asset owners to hold and transfer assets without the need for a centralized processing authority.

16.     Perhaps the best-known digital asset is Bitcoin. However, there are now more than 5,000 alternative blockchain-based assets generally known as "**altcoins.**" It is common for altcoin issuers to begin sales of altcoins in "**initial coin offerings**" or "**ICOs**" in a process that resembles an informal initial public offering of unregistered securities. More recently, altcoin offerings called "**initial exchange offerings**" or "**IEOs**" have moved to online trading platforms purporting to be legitimate securities exchanges engaging in offerings for companies raising capital. Collectively, ICOs and IEOs are referred to as "**altcoin offerings.**"

17.     The U.S. Securities and Exchange Commission has noted that altcoin offerings are frequently conducted in violation of applicable securities regulations and on exchanges not

properly registered with (or exempt from registration with) the SEC.[1] In the past several years, the SEC has aggressively ramped up enforcement activity against illegal altcoin offerings.

18.     In addition to being conducted outside any legitimate legal framework, altcoin offerings have frequently proven merely to be a new take on old "pump-and-dump" investment scams or simply offerings of valueless and fraudulent securities. In addition, a cottage industry has grown up around altcoin offerings to pursue other kinds of fraud, such as soliciting bogus investment fees from investors or conducting old-fashioned ponzi schemes dressed up as novel, "cutting-edge" investment opportunities.[2]

19.     Sometime in 2018, Cutting began running a scheme under which he took "deposits" from the public for a fund that supposedly invested in altcoin offerings (the "**Crypto Fund**").

20.     The Crypto Fund was simply a scam to induce investors to hand over ever increasing amounts of money by fraudulently stating that investments were growing rapidly

---

[1] *See, e.g, Statement on Potentially Unlawful Online Platforms for Trading Digital Assets*, SECURITIES AND EXCHANGE COMMISSION (Mar. 7, 2018) https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; *Statement on Cryptocurrencies and Initial Coin Offerings*, SECURITIES AND EXCHANGE COMMISSION (Dec. 11, 2017); https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11; *Investor Bulletin: Initial Coin Offerings*, SECURITIES AND EXCHANGE COMMISSION (Dec. 11, 2017) https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, SECURITIES AND EXCHANGE COMMISSION (May 7, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-alerts/investor-39

[2] *See Investor Alert: Ponzi Schemes Using Virtual Currencies*, S.E.C. OFFICE OF INVESTOR EDUCATION AND POLICY *available at* https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.

and could be withdrawn on request when in fact the money was either being squandered or stolen and could not be withdrawn.

21.     Acting on a suggestion from a friend, on November 4, 2018, Powell invested Bitcoin worth $13,766.00 in the Crypto Fund using a CTM online portal.

22.     Before Powell made his initial investment, CTM made no meaningful cautionary disclosures to Powell or provided him with a prospectus, a subscription agreement, or the like. Powell never executed any written agreement with Defendants.

23.     At no point did Defendants take any steps to confirm Powell's identity or his status as an accredited or sophisticated investor.

24.     That same day, Powell received an automated email receipt from CTM acknowledging the investment and stating, "I understand that my deposit will be converted to US Dollars and stored in my account balance in US Dollars."

25.     The above deposit receipt language appeared in every CTM deposit receipt received from Defendants by Powell or Knafo.

26.     After making his initial investment, Powell began receiving monthly email "newsletters" as well as separate "earnings updates" emails from Cutting. After Knafo made her initial investment later on, she received similar or identical monthly newsletters and earnings updates as well.

27.     The monthly earnings updates always showed Plaintiffs' account values with fields for "earnings," "deposits," "withdrawals," and "active investment" expressed as U.S.

Dollars. These emails also had a specific field indicating what withdrawals had occurred during that period.

28.     Although Cutting signed the newsletter and earnings update emails as the "CTC Team" or "CTM Team" the CTC or CTM team consisted solely of Cutting and Lata. Each newsletter and earnings update ended with a hyperlink to an online form through which recipients could invest additional funds.

29.     On December 1, 2018, Cutting sent a newsletter stating that despite a 40% drop in the altcoin market, the Crypto Fund made "a positive 9% gain for the month of November [2018]." This email caused Powell to believe that his investment gains would be expressed in U.S. Dollars. On the same day, Cutting sent Powell an earnings update showing that Powell's investment had grown by 9% during November 2018 to a total "active investment" amount of $15,004.94.

30.     On January 2, 2019, Cutting sent Powell a newsletter stating that the Crypto Fund "managed to end in the green 11 of the 12 months for 2018" and was "able to get up to a 7% gain" for the month of December 2018. The same email suggested that the Crypto Fund would soon see "gains of up to 6000 – 15000%." On the same day, Cutting sent Powell an earnings update showing that Powell's investment had grown by 7% during December 2018 to a total "active investment" amount of $16,055.28.

31.     On February 2, 2019, Cutting sent Powell a newsletter stating that although the altcoin market had dropped by 21%, the Crypto Fund "ended up in the green for a 4.5% gain that has been added to your portfolio." On the same day, Cutting sent Powell an earnings

update showing that Powell's investment had grown by 4.5% during January 2019 to a total "active investment" amount of $16,777.76.

32.     On March 4, 2019, Cutting sent Powell an earnings update showing that Powell's investment had grown by 7.1% during February 2019 to a total "active investment" amount of $17,968.98.

33.     On April 2, 2019, Cutting sent Powell an earnings update showing that Powell's investment had grown by 8.5% during March 2019 to a total "active investment" amount of $19,496.34.

34.     On April 3, 2019, Cutting sent Powell a newsletter stating that the Crypto Fund had experienced "a slight upward trend again for March for a gain of 8.5%." The newsletter encouraged investors to deposit more funds, stating, "If you are planning to jump into the Crypto World with both feet, I wouldn't wait much longer, because gains tend to happen fast."

35.     Relying on regular emails indicating that his investment was undergoing explosive growth and could be readily withdrawn, Powell decided to invest more funds. On April 22, 2019, Powell clicked on the "Deposits" hyperlink in the most recent newsletter and was directed to Lata's personal PayPal account where he deposited $17,092.00. Powell received a deposit receipt for the investment from Lata's personal PayPal account as well as CTM.

36.     On May 4, 2019, Cutting sent Powell an earnings update showing that Powell's investment had grown by 6% during April 2019 to a total "active investment" amount of $38,257.91.

37.     On May 6, 2019, Cutting sent Powell a newsletter stating that the Crypto Fund "had another positive gain for April [2019]." The newsletter went on to make the following false statements:

> Crypto Traders Management operates a Hedge Fund that was formed for the purpose of investing in a portfolio of cryptocurrencies and other blockchain technology assets. We determine whether a Crypto-Asset qualifies for inclusion in the portfolio according to market opportunity, technical specifications, and investment timing.
>
> . . . .
>
> CTM implements advanced security measures of operations and will utilize an in-house proprietary secure platform that mitigates counter-party risk and uses multi-signature authorization for transfers, trades, purchases, or sales of funds.

38.     Relying on regular emails indicating that his investment was undergoing explosive growth and could be readily withdrawn, Powell invested $1,075.00 on May 9, 2019. To make the investment, Powell clicked on the "Deposits" hyperlink in the most recent newsletter and was directed to Lata's personal PayPal account. That same day, he received deposit receipts from Lata's personal PayPal account as well CTM. On May 10, 2019, Lata emailed the CTM receipt to Powell again, purporting to write on behalf of the "CTM Team."

39.     On May 15, 2019, CTM administratively dissolved.

40.     Having been told for over 6 months that his investment was safe, accessible, and steadily increasing in value, Powell began considering whether to make a much larger investment but wanted to be sure that he could withdraw the money if needed. On May 20, 2019, he emailed Lata several questions, including: "How would I make a large withdrawal?" Lata responded the next day stating that Powell could invest up to $5 million. She wrote, "We

would do a large withdrawal by selling out on the exchange, transfer to the bank and wire back to you. We could do it in [Bitcoin] if you prefer." Lata added that Powell's "timing in this market couldn't be better!"

41.     On June 5, 2019, Cutting sent Powell a newsletter stating that the Crypto Fund "made SAFE gains with a small percentage that we are day and swing trading with." That same day, Cutting sent Powell an earnings update showing that Powell's investment had grown by 6% during May 2019 to a total "active investment" amount of $41,659.51.

42.     On July 2, 2019, Cutting sent Powell a newsletter noting that although the altcoin markets were in "a panic," the Crypto Fund "played it safe and had an okay month of trading." That same day, Cutting sent Powell an earnings update showing that Powell's investment had grown by 6.67% during June 2019 to a total "active investment" amount of $44,438.19.

43.     On July 9, 2019, Lata coordinated with Powell to wire $500,000.00 into a bank account under the name "Crypto Traders Management, LLC Shawn Cutting."

44.     Having been led to believe the Crypto Fund was a legitimate and successful investment vehicle, Powell suggested to Knafo that she also invest.

45.     Relying on representations that Cutting and Lata made to Powell, on July 28, 2019, Knafo invested $4,745.94 of Bitcoin in the Crypto Fund. Later that day, Knafo received a CTM deposit receipt.

46.     On July 30, 2019, Lata emailed Knafo stating that CTM "will send you reports periodically and monthly spreadsheets with information regarding your account and any new

changes." The email contained both a "withdrawals" hyperlink and an email address to which Knafo could submit withdrawal requests.

47.     The July 30, 2019, message also stated that CTM "had [its] attorneys, that are the best of the best, create a mutual trading agreement between ourselves and our clients," followed by a hyperlink to a "Crypto Traders Management Service Agreement" (the "**Service Agreement**"). The Service Agreement is apparently not drafted by someone with legal training. The Service Agreement refers to the investor as the "Client" and provides that:

      a.     The trade name Crypto Traders Management is "synonymous with" all CTM employees and to Shawn Cutting in their individual capacities, and does not merely refer to the CTM entity;

      b.     The minimum investment period is 90 days, during which a withdrawal penalty will apply, but only to withdrawals of the original investment principal, not to earnings;

      c.     After the initial 90 days, "Client may request a withdrawal from any deposited amounts and earnings," subject only to a processing fee of 5%;

      d.     "The Client reserves the right to terminate this agreement and close their account with Crypto Traders Management at any time," subject to an early termination fee; and

      e.     Defendants will charge a management fee of 30% of "earnings generated each reporting period (typically every month)."

48.     Knafo accepted the terms of the Service Agreement using an online form.

49.     In reliance on the above communications and the Service Agreement terms, and believing that she could withdraw her funds in accordance therewith, Knafo made an additional investment of Bitcoin worth $10,470.00 on August 2, 2019. She received a CTM deposit receipt shortly thereafter.

50.     Between August 5, 2019, and August 7, 2019, Cutting sent similar newsletters to Powell and Knafo stating that the Crypto Fund ended July 2019 "in the green."

51.     On August 5, 2019, Cutting sent Powell an earnings update stating that his investment grew by 3.65% in July 2019, for a total "active investment" of $564,310.18.

52.     On August 7, 2019, Cutting sent Knafo an earnings update stating that her investment grew by 3.3% in July 2019, for a total "active investment" of $4,902.61 as of month's end.

53.     On August 17, 2019, in reliance on previous communications from Cutting and Lata, Knafo wired $1,030.25 to a bank account under the name Crypto Traders Management, LLC for a net investment of $1,000.00.

54.     On August 20, 2019, in reliance on previous communications from Cutting and Lata, Knafo wired $19,027.75 to a bank account under the name Crypto Traders Management, LLC for a net investment of $18,980.00.

55.     On September 5, 2019, in reliance on previous communications from Cutting and Lata, Knafo wired $20,029.00 to a bank account under the name Crypto Traders Management, LLC, for a net investment of $20,000.00.

56.     Between September 6, 2019, and September 9, 2019, Cutting sent Powell and Knafo newsletters stating that although the altcoin markets lost 10% of their value in August 2019, the Crypto Fund "ended the month with some positive gains."

57.     On October 7, 2019, Cutting sent Knafo an earnings update stating that her investment grew by 0% in September 2019, for a total "active investment" of $56,589.95.

58.     Between October 7, 2019, and October 8, 2019, Cutting sent Powell and Knafo similar newsletters stating that even though there were "massive downswings" in the altcoin markets in September 2019, the Crypto Fund "ended with a zero percent gain." The newsletter sent to Powell went on to state, "We always say that you can't win them all, but……we have keep [sic] everyone out of the negative months since early 2018."

59.     On October 18, 2019, in reliance on previous communications from Cutting and Lata, Knafo wired $20,029.00 to a bank account under the name Crypto Traders Management, LLC, for a net investment of $20,000.00 after fees.

60.     On November 2, 2019, in reliance on previous communications from Cutting and Lata, Knafo made an additional investment of Bitcoin worth $18,660.00. She received a deposit receipt shortly thereafter.

61.     On November 4, 2019, in reliance on previous communications from Cutting and Lata, Knafo made an additional investment of Bitcoin worth $15,725.00. She received a deposit receipt shortly thereafter.

62.     Earnings updates and newsletters received by both Powell and Knafo after making all their investments represented that the value of their accounts was either static or growing every month.

63.     In a newsletter sent to Powell and Knafo between March 15, 2020, and March 18, 2020, Cutting admitted that he was falsely reporting account values to investors. He wrote that altcoins held in the Crypto Fund could not be sold at market value without "causing a severe loss." He wrote, "With the current market conditions, it makes it very difficult to get

sell orders to fill without taking a big loss on your end and we have no time frame to give you as to when you can expect the withdrawal." Instead, he urged investors to wait until the portfolio prices rebounded and altcoin holdings could be sold without a loss but provided no information as to how long that would take.

64.     Starting as early as August 2019, Powell began requesting regular monthly withdrawals to cover expenses and taxes. Cutting agreed to the requests verbally and in writing but did not provide monthly withdrawals as agreed. Since September 2019, Cutting has ignored literally dozens of phone calls, voicemails, text messages, emails, and form submissions from Powell seeking to withdraw funds. Cutting claims to be unreachable, out of cell service, unable to process requests, and the like. Most communications simply go unanswered.

65.     Even after dodging Powell's withdrawal requests for months, and even after admitting that the market value of Crypto Fund assets did not support account valuations being sent to investors, Cutting sent an earnings update to Powell on May 9, 2020, stating that Powell's "active investment" had grown to $603,750.35.

66.     On May 16, 2020, Powell demanded that Cutting close his account and remit the entire $603,750.35 balance. Powell has since repeated this demand through previous counsel.

67.     On May 18, 2020, Cutting told Powell's previous counsel that sale of altcoins attributed to Powell's account would cause an 80% loss of Powell's investment funds.

68.     Of Powell's $531,933.00 total net investment, he has only recovered a total of $50,000.00 by receiving only the following payments:

   a.  8/14/2019 - $10,000.00

   b.  11/7/2019 - $20,000.00

   c.  1/10/2020 - $20,000.00

69. All interest calculations in this Verified Complaint take into account the payments above when made.

70. On February 11, 2020, Knafo sent a request to Cutting to close her account and withdraw all her funds, followed by at least 3 more similar requests. Since her initial request to close her account, she has also repeatedly emailed Cutting and asked for her money back, but these emails have largely been ignored.

71. Despite repeated unfulfilled requests to obtain her money, Knafo received earnings statement from Cutting on February 11, 2020, March 13, 2020, April 11, 2020, and May 13, 2020, all indicating her "active investment" amount was $119,375.94.

72. Of Knafo's $109,581.00 net investment, she has recovered nothing.

73. Investments in the Crypto Fund are "securities" as defined in the Exchange Act, 15 U.S.C. § 78c(a)(10), and the Securities Act, 15 U.S.C. § 77b(a)(1), as investment contracts because:

   a.  Plaintiffs invested money and other assets readily convertible into money;

   b.  Defendants' operation of the Crypto Fund incorporated money contributed by other investors and managed by Defendants in a common enterprise to generate returns;

   c.  Plaintiffs expected to earn a profit on their investment; and

   d.  The profit to be generated by the Crypto Fund was to be generated solely by the efforts of others, namely, Defendants.

74.     All sales of securities at issue in this case took place within the state of Idaho

75.     All sales of securities occurred online or through bank wire transfers and implicated internet and telephonic communications between parties of different states. Thus, all conduct alleged in this Complaint involves interstate commerce.

76.     No registration statement has ever been in effect for the securities.

77.     Plaintiffs are entitled to prejudgment interest reflecting interest on comparable investments. The bare minimum interest rate applicable here is the Idaho statutory interest rate, I.C. § 28-22-104, but evidence at trial will establish that an appropriate interest rate is much higher given the possibility of aggressive returns on properly managed altcoin investments and growth in other kinds of investments available to Plaintiffs.

## COUNT I
## SECURITIES FRAUD UNDER THE EXCHANGE ACT
### (All Defendants)

78.     Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

79.     Cutting for himself and for CTM made numerous assertions as to the value of, and changes in value of, investment accounts as described in the paragraphs above.

80.     Such assertions were false either because the value of underlying altcoin assets in the Crypto Fund were far too low to support Cutting's account valuations or because Cutting was simply stealing funds from investors.

81.     Assertions of value and gain were material to all of Plaintiffs' decisions to invest. Had they known that investments were declining in value or that account values were untrue, they would not have invested.

82.     The materially false statements directly caused Plaintiffs to make their investments, who acted in reliance thereon.

83.     As the fund manager, Cutting was aware that the statements on value and gain were false when he made them.

84.     Cutting intended for the representations on value and gain to overstate the Crypto Fund performance to generate additional interest and investment in the Crypto Fund.

85.     Lata and Cutting, acting for themselves and for CTM, both made statements identified in the paragraphs above indicating that investments could be withdrawn and accounts could be closed promptly upon notice to Defendants.

86.     Lata and Cutting knew these representations were false because they did not ever intend to promptly comply with withdrawal notices and/or they knew that the Crypto Fund portfolio could not support withdrawals up to the full stated investor account values.

87.     Lata and Cutting made the representations intending to induce prospective investors to contribute more money.

88.     Plaintiffs would not have made any investments if they knew they would be unable to withdraw their money on request.

89.     Plaintiffs were unaware that Defendants' misrepresentations were untruthful and could not have been aware of the statements' untruth because Plaintiffs had no access to

data on the Crypto Fund's portfolio. In May 2020, Powell requested information on the Crypto Fund's underlying portfolio and the cost per unit of his investments but these requests have been refused or ignored.

90.     Defendants all participated in the sale of Crypto Fund investments, which are securities under the Exchange Act. Cutting coordinated these sales directly for himself and CTM. With regard to Lata, she also accepted investment funds into her personal PayPal account.

91.     Cutting was a control person of CTM under Exchange Act § 20(a), 15 U.S.C. § 78t(a), as its sole manager and member.

92.     Lata was a control person of CTM under Exchange Act § 20(a), 15 U.S.C. § 78t(a), in her role as an agent managing the sale of, soliciting sale of, accepting funds for, and communicating with investors regarding, securities.

93.     Defendants' actions of repeatedly misstating the value, gain, and liquidity of securities amounted to a manipulative or deceptive device or contrivance in connection with the sale of securities under Exchange Act § 10(b).

94.     Lata and Cutting aided and abetted each other and CTM under Exchange Act § 20(e), 15 U.S.C. § 78t(e), by knowingly and/or recklessly providing substantial assistance in making false and misleading representations to investors and prospective investors.

95.     Defendants are all jointly and severally liable to Plaintiffs for all damages proximately caused by their fraudulent misdeeds in amounts no less than the following:

    a.     David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

     b.     Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

**COUNT II**
**SALE OF UNREGISTERED SECURITIES**
**(All Defendants)**

96.     Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

97.     Plaintiffs' claim for sale of unregistered securities under Securities Act § 12(a)(1) applies only to the security transactions occurring within 1 year prior to the filing of this Complaint, pursuant to the statute of limitation, Securities Act § 13, 15 U.S.C. § 77m.

98.     On information and belief, Defendants did not begin offering securities to the public until 2018, satisfying the 3-year statute of repose, Securities Act § 13, 15 U.S.C. § 77m. Defendants sold securities to 15 purchasers at minimum and accepted investment through a web portal from any member of the public. Defendants made no effort to:

     a.     verify purchasers' identities or other information, except as necessary to facilitate payments;

     b.     limit the Crypto Fund to investors with whom Defendants had a prior relationship—in fact, neither Plaintiffs had meaningful contact with Defendants prior to making their investments through a publicly accessible online portal;

     c.     make any disclosures or warning statements to prospective investors;

     d.     gauge the sophistication of prospective investors; or

     e.     ensure that investors had the means to sustain a loss of their investment.

99.     Defendants passed title to the securities to Plaintiffs and/or solicited Plaintiffs' purchase of securities by, among other things, repeatedly sending messages with links to

deposit funds and other assets, making a deposit form available, coordinating transfers of value, and accepting transfers of value, sometimes (in the case of Lata) into personal PayPal accounts.

100.   Defendants therefore sold and offered to sell securities for which no registration statement was in effect or has ever been in effect.

101.   No exemption to registration applies to the securities, which were offered to the public regardless of investor or offeree status as accredited investors. Defendants took no other steps to comply with any registration exemption.

102.   Plaintiffs are entitled to rescission of their securities purchases.

103.   Under Securities Act § 12(a)(1), 15 U.S.C. § 77*l* Defendants are strictly liable to Plaintiffs in amounts no less than the following:

      a.   David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

      b.   Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT III
## SECURITIES FRAUD UNDER THE IDAHO UNIFORM SECURITIES ACT
### (All Defendants)

104.   Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

105.   As stated above, Defendants made false and misleading statements regarding the value, gain, and liquidity of Crypto Fund securities.

106.   Plaintiffs, having no access to information regarding the Crypto Fund's assets or positions—or indeed any data on financial performance—could not have known of the untruth of these statements in the exercise of reasonable care.

107.    Plaintiffs relied on Defendants' representations in deciding to invest in Defendants' securities.

108.    Cutting directly and indirectly controlled the affairs of CTM as its sole member and manager under I.C. § 30-14-509(g)(1) and (2).

109.    Lata directly and indirectly controlled the affairs of CTM by soliciting purchases, receiving funds, and communicating with investors under I.C. § 30-14-509(g)(1) and (2).

110.    Cutting and Lata were associated with, or employees of, each other and CTM and materially aided in the fraudulent conduct described herein under I.C. § 30-14-509(g)(3). Both knew and had reason to know that representations described herein due to their positions of control and authority.

111.    The securities purchased by Plaintiffs are not certificated and so no further action is required to tender the securities back to Defendants.

112.    Plaintiffs are entitled to recover consideration paid for the Crypto Fund securities, plus costs and reasonable attorney fees under I.C. § 30-14-509(b)(1).

113.    Defendants are all jointly and severally liable to Plaintiffs for all damages proximately caused by their misconduct in amounts no less than the following:

    a.    David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

    b.    Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT IV
## ACTING AS AN UNREGISTERED BROKER UNDER THE IDAHO UNIFORM SECURITIES ACT
### (All Defendants)

114.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

115.    Cutting, for himself and CTM, was engaged and is engaged in the business of using investor funds to effect transactions in altcoins.

116.    Altcoins bought and sold by Cutting and/or CTM are "securities" under I.C. § 30-14-102(28) as investment contracts for the following reasons:

      a.    The altcoins are purchased with money or assets readily convertible into money, such as Bitcoin or other altcoins;

      b.    Altcoins are typically common enterprises to raise money to fund a business venture;

      c.    Altcoin buyers purchase the assets expecting to derive a profit in increased altcoin value; and

      d.    The increased value is due to the efforts of the altcoin issuers and others.

117.    In addition, Lata, as an agent of Cutting and/or CTM, and Cutting, as an agent of CTM, solicited prospective investors to purchase Crypto Fund securities.

118.    Defendants therefore were and are acting as "broker-dealers" under I.C. § 30-14-102(4).

119.    Defendants have never registered as broker-dealers with the Idaho State Department of Finance as required under I.C. § 30-14-401(a).

120.    Cutting and Lata sold Crypto Fund securities to Plaintiffs in violation of I.C.
§ 30-14-401(a).

121.    Cutting and CTM effected securities transactions on behalf of consumers in
violation of I.C. § 30-14-401(a).

122.    Pursuant to I.C. § 30-14-509(d), Cutting and CTM are jointly and severally
liable to return the consideration paid in at least the following amounts:

      a.    David Powell: $519,254.51, with interest accruing at the Idaho
statutory rate of $101.18 per diem as of 7/10/2020; and

      b.    Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory
rate of $15.78 per diem as of 7/10/2020.

123.    In addition, Cutting and CTM are liable for Plaintiffs' costs and attorney fees
under I.C. § 30-14-509(b)(1) and -509(d).

## COUNT V
## IDAHO CONSUMER PROTECTION ACT
### (All Defendants)

124.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth
herein.

125.    Defendants offered their services as fund managers for investors. As described
above, Defendants are engaged in a systematic scheme to misrepresent the value, gain, and
liquidity of Crypto Fund investments.

126.    Defendants also misrepresented their ability to provide investment services by
indicating that they had competent legal counsel, auditors, analysts, fund managers, and IT
professionals on staff.

127.     Defendants engaged in conduct constituting unfair and deceptive acts or practices under I.C. § 48-603.

128.     In reliance on Defendants' deceptive acts and practices, Plaintiffs invested significant funds, nearly all of which are lost.

129.     Under I.C. § 48-608(1), Defendants are liable for all damages proximately caused by their misconduct, in amounts no less than the following:

        a.     David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

        b.     Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

130.     Plaintiffs are entitled to declaratory relief against Defendants' further conduct in soliciting investment, offering or selling securities, effecting securities transactions for others, or in holding themselves out as fund managers.

131.     Defendants engaged in a sustained, repeated, and flagrant scheme to defraud Plaintiffs and other investors. In the process, they have stolen hundreds of thousands of dollars from innocent people. They are therefore liable for punitive damages in an amount to be proven at trial, but which is at minimum the greater of $250,000 or triple the actual damages with regard to each Plaintiff.

132.     Plaintiffs are entitled to costs and attorney fees pursuant to I.C. § 48-608(5).

## COUNT VI
## COMMON-LAW FRAUD
### (All Defendants)

133.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

134.    Defendants repeatedly represented the value, appreciation, and liquidity of the Crypto Fund, as noted above. Defendants also specifically asserted that:

    a.    Their operations are audited monthly;

    b.    They have competent counsel, certified public accountants, IT professionals, and analysts; and

    c.    They purchase and sell altcoins on legitimate (i.e. registered) securities exchanges.

135.    These representations were all false and Defendants, as the only two people working on the project, were aware of that.

136.    Plaintiffs did not and could not know that the above representations were false.

137.    Defendants intended for Plaintiffs to rely on the statements so as to obtain additional investment.

138.    If Plaintiffs had known that these misrepresentations were false, they would have known that their investments were on their way to becoming worthless and were not being managed by competent fund managers. Hence, the misrepresentations were material.

139.    Plaintiffs had a right to rely on representations by people soliciting their investment and had no reason not to at the time they made their investments.

140.    Plaintiffs have lost significant sums of money.

141.     Cutting and Lata acted in active concert, aiding and abetting each other and CTM in the commission of these torts.

142.     All Defendants are jointly and severally liable to Plaintiffs for damages proximately caused by the fraud in amounts no less than the following:

        a.     David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

        b.     Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT VII
## BREACH OF CONTRACT
### (All Defendants)

143.     Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

144.     By accepting investments from Plaintiffs in their personal capacities and on behalf of CTM, Lata and Cutting created actual and implied contractual relationships with Plaintiffs.

145.     The terms of these contracts are contained in the Service Agreement or, if the Service Agreement did not form an express agreement among the parties, then implied terms similar thereto applied.

146.     Among the terms governing Plaintiffs' investments were that Plaintiffs could make withdrawals at any time in amounts contained in their earnings statements, could close their accounts at any time, and could expect accurate information as to their account status and value.

147.   Defendants breached these contract terms by lying about the value of Plaintiffs' accounts and refusing to honor withdrawal requests.

148.   Specifically, and in addition to the foregoing, Defendants have breached the contract terms by failing to return original invested funds and/or by failing to pay Plaintiffs the amounts identified as "active investments" in their earnings statements.

149.   Defendants have damaged Plaintiffs in amounts no less than the following, plus interest at the statutory rate. These amounts reflect Defendants' failure to turn over the account statements as of the dates Plaintiffs demanded to finally close their accounts, plus pre-judgment interest at the Idaho statutory rate from that date:

   a.   Plaintiff David Powell: $609,724.27 in damages and interest, plus pre-judgment interest accruing at the rate of $87.59 per diem as of 7/10/2020; and

   b.   Plaintiff Merav Knafo: $122,797.10 in damages and interest, plus pre-judgment interest accruing at the rate of $17.64 as of 7/10/2020.

## COUNT VIII
## CONSTRUCTIVE TRUST
### (All Defendants)

150.   Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

151.   Defendants have received hundreds of thousands of dollars due to fraud and other unconscionable behavior.

152.   This Court should impose a constructive trust on all of Plaintiffs' investment funds and order those assets returned to Plaintiffs in amounts no less than the following:

   a.   David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

b.      Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT IX
## CONVERSION
### (All Defendants)

153.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

154.    Defendants are exercising dominion and control over Bitcoin and money so as to deprive Plaintiffs of their rights to control their property.

155.    Defendants have refused to return Plaintiffs' investments.

156.    Defendants have converted Plaintiffs' investments to their own use and have spent, hidden, or given away the investments.

157.    Defendants have exceeded the scope of their authorized use of Plaintiffs' property by using it for personal purposes and/or refusing to return the investments as agreed.

158.    Defendants have dispossessed Plaintiffs of their property in bad faith by intentionally orchestrating a scheme to obtain and either steal or squander investors' money.

159.    Defendants have aided and abetted each other in a chain of conduct to convert Plaintiffs' funds and are therefore jointly and severally liable for all damages

160.    In addition to the above, Cutting, as agent for CTM, is personally liable for all damages sustained by Plaintiffs for investments he received personal possession of.

161.    In addition to the above, Lata, as agent for Cutting and/or CTM, is personally liable for all damages sustained by Plaintiffs for investments she received personal possession of.

162.    Defendants are jointly and severally liable to Plaintiffs in at least the following amounts:

    a.    David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

    b.    Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT X
## NEGLIGENCE
### (All Defendants)

163.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

164.    By taking possession of Plaintiffs' assets, Defendants assumed a duty to Plaintiffs to act with reasonable care in the management and safeguarding of Plaintiffs' investments.

165.    Defendants lack experience, training, certification, and intelligence necessary to properly manage an investment fund. They have failed to comply with applicable state and federal regulations applicable to public securities issuers, investment advisors, investment companies, broker-dealers, and other investor fiduciaries or agents of the foregoing. Defendants further failed to act as reasonable persons under like circumstances by properly analyzing investments, hedging risk, diversifying the Crypto Fund portfolio, maintaining internal controls, and/or following appropriate security measures.

166.    As a proximate result of Defendants' negligence, Plaintiffs suffered damages in the loss of their investments in at least the following amounts:

      a.      David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

      b.      Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

**COUNT XI**
**UNJUST ENRICHMENT**
**(All Defendants)**

167.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

168.    Defendants held themselves out as professional fund managers.

169.    Defendants received benefits from Plaintiffs in the form of money and Bitcoin.

170.    Defendants appreciated these assets by the assets to fund their personal expenses, to pad their investment portfolio, and to otherwise use the assets to attempt to generate returns upon which they could charge fees.

171.    Defendants represented that investments were increasing in value and could be withdrawn.

172.    It would be inequitable for Defendants to retain the benefit of Plaintiffs' investments.

173.    Plaintiffs suffered damages in the loss of their investments in at least the following amounts:

      a.      David Powell: $519,254.51, with interest accruing at the Idaho statutory rate of $101.18 per diem as of 7/10/2020; and

      b.      Merav Knafo: $115,731.43, with interest accruing at the Idaho statutory rate of $15.78 per diem as of 7/10/2020.

## COUNT XII
## ACCOUNT STATED
### (Cutting and CTM)

174.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth

herein.

175.    Plaintiffs and Cutting and CTM dispute the value of Plaintiffs' accounts.

176.    On May 16, 2020, Cutting sent Powell an account statement indicating that

his account balance was $603,750.35.

177.    On February 11, 2020, March 13, 2020, April 11, 2020, and May 13, 2020,

Cutting sent Knafo account statements all indicating that her account balance was $119,375.94.

178.    CTM and Cutting assented to these account balances because they were the

ones who created the statements. Plaintiffs have assented to the balances by attempting to

withdraw the money in the amounts stated.

179.    CTM and Cutting therefore are liable to Plaintiffs for the account stated

amounts as follows:

      a.    Plaintiff David Powell: $609,724.27 in damages and interest, plus pre-
judgment interest accruing at the rate of $87.59 per diem as of 7/10/2020; and

      b.    Plaintiff Merav Knafo: $122,797.10 in damages and interest, plus pre-
judgment interest accruing at the rate of $17.64 as of 7/10/2020.

## COUNT XIII
## BREACH OF FIDUCIARY DUTY
### (All Defendants)

180.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth

herein.

181.    Defendants entered into a fiduciary relationship with Plaintiffs because Plaintiffs relied on Defendants to prudently invest and safeguard their funds.

182.    Defendants breached their fiduciary duties of loyalty to Plaintiffs by misappropriating their investment funds.

183.    Defendants breached their fiduciary duties of care to Plaintiffs by squandering their investment funds.

184.    Defendants have caused a total loss of Plaintiffs' investments through their mismanagement.

185.    Defendants are liable to Plaintiffs in amounts to be proven at trial.

## COUNT XIV
## PUNITIVE DAMAGES
### (All Defendants)

186.    Plaintiffs repeat and reallege all the preceding paragraphs as if fully set forth herein.

187.    For months, Defendants repeatedly and deliberately lied to Plaintiffs about the value, growth, and availability of their investment funds. These lies were part of an ongoing, fraudulent scheme to encourage investors to put more money into Defendants altcoin investment scam.

188.    Defendants' ongoing conduct is outrageous and conducted without regard for the effect it has on investors, who have placed Defendants in a position of trust.

189.    Defendants have continued to lie to Plaintiffs about the value of their accounts and the availability of their funds even after the scam has come to light.

190.     Under I.C. § 6-1604, Defendants are liable for punitive damages in an amount to be proven at trial, but which is at minimum the greater of $250,000 or triple the actual damages with regard to each Plaintiff.

## JURY TRIAL DEMAND

191.     According to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on any issue so triable.

## COSTS AND FEES

192.     Due to Defendants' fraudulent misconduct, breach of federal and state statutes, and other wrongdoing described above, Plaintiffs separately retained legal counsel to attempt to recover their investments. They have also been forced to retain the services of MOONEY WIELAND PLLC to seek recovery in this litigation.

193.     Plaintiffs shall be entitled to recover attorney fees pursuant to Fed. R. Civ. P. 54, I.C. §§ 12-121, 30-14-509(b), and 48-608(5), among others.

194.     In the event that Plaintiffs take a default judgment against Defendants, or any of them, the amount of $20,000.00 shall constitute a reasonable attorney fee.

## PRAYER FOR RELIEF

**Wherefore**, Plaintiffs request judgment as follows:

1.     An award of damages against Defendants jointly and severally in favor of Plaintiff David Powell in an amount to be determined at trial, but in no event less than $609,724.27, with interest accruing at the rate of $87.59 per diem as of July 10, 2020;

2.      An award of damages against Defendants jointly and severally in favor of Plaintiff Merav Knafo in an amount to be determined at trial, but in no event less than $122,797.10, with interest accruing at the rate of $17.64 per diem as of July 10, 2020;

3.      Punitive damages against Defendants jointly and severally and in favor of each Plaintiff separately for the greater of $250,000.00 or triple the actual damages awarded to Plaintiffs respectively;

4.      An imposition of a constructive trust on all of Plaintiffs' investment funds in the amount of: $641,513.94;

5.      An award against Defendants jointly and severally of costs and expenses of suit;

6.      An award against Defendants jointly and severally for Plaintiffs' reasonable attorney fees, which shall in the event of default judgment be $20,000.00; and

7.      Such other and further relief as the Court deems just and proper.


Dated July 15, 2020

Steve Wieland, ISB No. 8282
steven.wieland.service@mooneywieland.com
MOONEY WIELAND PLLC
802 W. Bannock St., Ste 500
Boise, ID 83702
t: 208.401.9219
f: 208.401.9218

*Counsel for Plaintiffs*

## VERIFICATION

The undersigned Plaintiffs depose and declare that we are the individual Plaintiffs named in this lawsuit and have authorized the filing of this Verified Complaint. We have reviewed the allegations made in this Verified Complaint and to those allegations which we have personal knowledge, believe them to be true. As to those allegations of which we do not have personal knowledge, we rely on information, communications, and documents provided by each other and believe them to be true.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*David Powell*
David Powell (Jul 12, 2020 18:16 MDT)
_____
David Powell

Jul 12, 2020
_____
Date

*Merav Knafo*
_____
Merav Knafo

Jul 12, 2020
_____
Date