UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID POWELL, an individual, and MERAV KNAFO, an individual,<br><br>        Plaintiff,<br><br>        v.<br><br>CRYPTO TRADERS MANAGEMENT, LLC, a dissolved Idaho limited liability company; SHAWN CUTTING, individually and as trustee of the Lake View Trust; COURTNEY LATA, an individual; JANINE CUTTING, individually and as trustee of the Lake View Trust, ASH DEVELOPMENT, LLC, an Idaho limited liability company; GOLDEN CROSS INVESTMENTS, LLC, an Idaho limited liability company; CRYPTO TRADERS FUND, LP, a Delaware limited partnership; and, the LAKE VIEW TRUST,<br><br>        Defendants. | Case No. 2:20-cv-00352-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

This case arises out of an alleged Ponzi scheme masquerading as a cryptocurrency investment fund. Plaintiffs David Powell[1] and Merav Knafo allege that Defendant Shawn Cutting, with the help of his daughter, Defendant Courtney Lata, lured them into investing in Cutting's company, Crypto Traders Management, LLC ("CTM"), through false representations and then misappropriated their investor funds for his personal use in violation of federal and state law.

Plaintiffs now seeks summary judgment against Defendants Shawn Cutting, Courtney Lata, Janine Cutting, and Lake View Trust and default judgment against CTM, Crypto Traders Fund, LP ("CTF"), and Golden Cross Investments, LLC. (Dkt. 171). Defendants Shawn Cutting and Janine Cutting, appearing *pro se*, have filed a motion for extension of time to respond to the motion for summary judgment and to set aside default.

For the reasons set forth below, the Court will grant Plaintiffs' request for summary judgment against Cutting and default judgment against CTM, CTF, and Golden Cross, in part. The Court, however, will deny Plaintiffs request for

---

[1] Plaintiff David Powell passed away on July 20, 2023. On February 1, 2024, the Court granted the motion to substitute The Estate of David Powell, by and through Ian Powell, personal representative, as a plaintiff in place of David Powell pursuant to Fed. R. Civ. P. 25(a). For clarity, the Court will continue to refer to the plaintiff as David Powell.

summary judgment against Lata and Lake View Trust, and grant in part and deny in part summary judgment against Janine Cutting.

# BACKGROUND

## 1.   Factual Background

### A.   *Cryptocurrency Market*

In recent years, interest in digital assets has soared worldwide. Often called "cryptocurrencies," there are now numerous digital assets based on blockchain technology, which allows asset owners to hold and transfer assets without the need for a centralized processing authority.  Perhaps the best-known digital asset is Bitcoin, but now more than 5,000 alternative blockchain-based assets generally known as "altcoins" exist. "Touted for benefits including decentralization, technological advancement, and security, cryptocurrencies also carry with them risk — and not just in the sense of frequent and significant fluctuations of value inherent in many financial products. As a new and ever-developing concept, and with new cryptocurrencies popping up like dandelions, cryptocurrencies have evaded significant regulation, raising the risk for fraud and other misconduct." [2] Plaintiffs here allege that Cutting and Lata perpetrated such a fraud using cryptocurrency.

---

[2] *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 390 (S.D.N.Y. 2021).

### B.    Cutting, CTM, and Cryptocurrency Fund

Cutting began cryptocurrency investing in early 2017 and conceived of the "initial prototype for crypto currency trading" in October 2017. *Cutting Decl.*, Nov. 25, 2020, ¶ 27, Dkt. 17-1. By December 2017, Cutting decided to form CTM to operate a cryptocurrency trading hedge fund. He retained a law firm to assist with the formation, structuring and launch of CTM to operate the fund.  *Id.*; *Riveles Decl.*, Sept. 8, 2021, ¶ 3, Dkt. 91-1.

In December 2017, Cutting also hired Mike Priest to perform administrative tasks related to CTM and the crypto fund, such as setting up accounts for clients wanting to make deposits and manually entering client information on Google spreadsheets. *Weiland Decl.*, Ex. C-    2, Dkt. 171-6.  Priest then hired Marc Dixon, a New Zealand computer programmer, to develop the website and administrative support services for CTM, "which allowed for the management of account balances and gain calculations for CTM clients." *Id.*

Around this same time, in December 2017, Cutting's daughter, Courtney Lata, quit her job at a coffee shop and started helping her father with managing CTM and the crypto fund. *Lata Decl.* ¶ 8, Dkt. 173-2.  Cutting only gave Lata "small tasks" to complete, and she "spent very little time assisting" her dad – "approximately a few hours a week." *Id.* ¶ 16. Lata continued regularly assisting her dad with CTM until December 2018, when she started real estate school. At

that point, her participation "dwindled and completely stopped in about mid-2019."
*Id.* ¶ 15.

For the period that Lata assisted her father, the record shows she collaborated with Marc Dixon to develop the "back office" software, including assisting with inputting data into the software. *Weiland Decl.*, Exs. F-G, Dkt 171-6. Lata also coordinated email messages to investors as a group and fielded questions from investors and potential investors in CTM, including questions from investors regarding the status of their withdrawal requests. *Id.*, Exs. H-K, Dkt. 171-6.

### C.    *Monthly Earning Updates and Newsletters*

Cutting attracted investment in the Crypto Fund by representing to investors that their deposits (cash or other digital assets) were pooled in a fund and invested in a diversified portfolio of digital assets and were growing rapidly. *Powell Decl.* ¶ 4, Ex. E, Dkt. 171-3; *Knafo Decl.*, 4, Ex. E, Dkt. 171-4. For those who invested in CTM, Cutting emailed monthly newsletters and an individualized "Earnings Update." *Powell Decl.*, Exs. E, F; *Knafo Decl.*, Exs. E, F. The monthly Earning Updates always showed each individual investor's account values with fields for "earnings," "deposits," "withdrawals," and "active investment" expressed as U.S. Dollars. These emails also had a specific field indicating what withdrawals had occurred during that period. These earning updates and newsletters consistently showed rapid growth and ended with a hyperlink to an online form through which

recipients could invest additional funds. *Powell Decl.*, Exs. E, F; *Knafo Decl.*, Exs. E, F.

To generate the reports, Cutting claims he would access the trading history data online from the various trading exchanges and then export the data from the websites as an excel spreadsheet, inputting gains, deposits, withdrawals, and the like into the system. *See generally Wieland Decl.*, Exs. C, D. Cutting further represented to investors that the Earning Updates resulted from work done by a "back office" with "auditors" at CTM:

> The short version of how the reporting works, is that after CTM (us) reports the trades averaged each week with the gains/losses to the back office, then the Admins do what they do in the back office and when they are done, they report it to the Auditors. After the Auditors do their thing in the back office, they report it to the CPA's. Once all of the reporting is finalized, then it goes back out to the Admins, so that the Admins can send out the reports out of the back office. **As you can see, we have several offices** that have work to do….

*Powell Decl.*, Ex. G-7; *Knafo Decl.*, Ex. H-1 (emphasis added).

CTM, however, did not have "several offices of "Auditors" reporting to "CPAs."  Nor has Cutting or CTM produced any evidence showing that CTM ever tracked—or ever had the capacity to track investor balances. Instead, the monthly Earning Updates were generated using the "back-office" software created by Marc Dixon with the data manually inputted by Cutting or Lata. *Weiland Decl*, Ex. G. Cutting and CTM have admitted the monthly Earning Updates did not accurately

reflect the value of client accounts – blaming the inaccuracies on exchanges shutting down, hackers, operation expenses, withdrawal fees, among other things. *Weiland Decl*, Ex. C, Interrog. Nos. 4-6.

In addition to misrepresenting that CTM was backed by a team of "Auditors" and "CPAs," CTM represented in its monthly newsletters and in emails that CTM's "legal team also secured the proper licensing required by us for trading," and that CTM was "registered and filed with the FTC & the USCTC for future operations as well." *Wieland Decl.*, Ex. I-1. In a similar vein, Lata informed new investors that "[w]e had our attorneys, that are the best of the best, create a mutual trading agreement between ourselves and our clients. This is a written agreement that keeps us compliant and protects not only us… but you as well." *Id.*, Ex. F-25.

These representations were also false. CTM was not registered with the Securities and Exchange Commission – although Cutting says he believed the law firm he hired "took every measure to get CTM 'legally' set up, registering CTM as [sic] with the SEC, setting CTM up with the IRS, etc." *Cutting Decl.*, Nov. 25, 2020, ¶ 27, Dkt. 17-1. In fact, however, Cutting failed to respond to the law firm's repeated requests to provide the documentation necessary to ensure that Cutting complied with federal securities laws. *Riveles Decl.* ¶ 11, Dkt. 91-1. The law firm also did not draft the agreement Lata referenced. Moreover, the USCTC appears to

be a fictional federal agency.

With respect to its security, Cutting and CTM represented in its newsletters that assets were being kept in a secure place with extensive security protocols to prevent loss and theft, claiming that "[s]ecurity and custody is [sic] a core component of the fund." *Powell Decl.*, Ex. F-8. As stated in one newsletter, Cutting claimed that CTM maintained "private keys in separate geographic regions and air gapped computers amongst other security measures to ensure peace of mind both for all invested." [3] *Id.* In other words, Cutting was claiming he would send representatives to geographically distant computers who would physically store and retrieve passcodes for CTM's trading accounts.  Cutting provides no evidence, however, that CTM followed any significant security protocols.

As noted, Lata also made various representations to investors and potential investors in sending and fielding emails. For example, Lata sent an email to a potential investor stating:

> We have a team of people behind us that ensure everyone is doing their job correctly and the safest way possible. We day trade cryptocurrency for people we want to help and that they

---

[3] "An air gap is a security measure that involves isolating a computer or network and preventing it from establishing an external connection. An air-gapped computer is physically segregated and incapable of connecting wirelessly or physically with other computers or network devices." To transfer data between a computer or network and an "air-gapped system," data must be copied to a removable media device such as a USB drive and physically carried by the user to the other system. https://www.techtarget.com/whatis/definition/air-gapping

don't have the time to do themselves. We never touch of any
your deposits, we just take a 30% 'fee' of the gains we make. If
you're not gaining, neither are we! We averaged 50-70%
AFTER the 30% we take off for last years bull run and have
been doing anywhere from 12-28% the last few months. We are
about to enter back into it for this upcoming run.

*Id.*, Ex. H-3.

Through Cutting and, to a lesser extent, Lata's efforts on behalf of her

father, from its inception in late 2017, CTM attracted nearly $7 million from over

500 investors.

### D.    *Actual Use of Investor Funds*

Contrary to CTM and Cutting's representations, Defendants have provided

no evidence that investor deposits were pooled in a fund and invested in digital

assets. Defendant have provided no documents showing that digital-asset

investments, such as Bitcoin, were invested, or otherwise showing what happened

to them. As for cash investments, the record indicates that millions of dollars of

investor money were deposited into two accounts: CTM's Chase Bank account, as

well as another account owned by Golden Cross Investments, LLC, an Idaho

limited liability company that Cutting set up in February 2019. *Cutting Decl.*, Nov.

25, 2020, ¶ 23, Dkt. 17-1.

From CTM's inception, Shawn and Janine Cutting used investor funds

deposited in the Chase Bank account to pay personal expenses, including

purchasing groceries, sporting goods, clothing, gold, silver coins, meals, home

improvements and Lata's wedding. For example, the November 2018 statement for

that account shows $275,200 being deposited and those funds being spent at

Applebee's, Home Depot, Victoria's Secret, Lululemon, Costco, Cabela's, iTunes,

Maverick, and Walgreens, among others. *Wieland Decl.*, Ex. O-8 to O-10. Funds

were also used to purchase gold and silver coins through a Dallas broker. *Id.*

Shawn and Janine Cutting and Lata were likewise all signers on the Golden

Cross Glacier account. This account was "set up as a personal account," according

to Cutting. *Cutting Decl.*, Nov. 25, 2020, ¶¶ 20, 22, Dkt. 17-1. Although Cutting

set the account up for personal use, statements show both Cutting and Lata

depositing investor money totaling at least at least $812,789.02 into the Golden

Cross account. Defendants have presented no evidence to suggest that Defendants

earned the money through means other than from CTM investors. *See Wieland*

*Decl.*, Ex. R. Additional funds amounting to $901,762.73 were deposited into Lake

View Trust, a spendthrift trust that Cutting set up in February 2018, with Shawn

and Janine Cutting as the trustees. Lata and her brother are the beneficiaries.

The record also shows that Cutting used investor cash to redeem prior

investors: Cutting paid investors at least $762,302 from the CTM bank accounts, at

least $489,650 of which came from investor funds. *See generally Knafo Decl.*, Ex.

L.  As just one example, Cutting made payments to his brother, Shane Cutting,

totaling $92,500 between December 2019 and July 2020. *Knafo Decl.*, Ex. L-14 to

L-16.

### E.    Refusals to Redeem and Lulling Conduct

As early as the end of 2018, CTM started evading at least some investors'

withdrawal requests – even though the monthly Earning Updates consistently

showed gains – while fulfilling other investors' withdrawal requests. *Weiland*

*Decl*., Ex. J-1 to J-3, Dkt. 171-6. When investors requested to withdraw funds from

CTM, Cutting made excuses, promised updates, and ultimately cut off

communication. For example, Cutting told investors that withdrawals were

suspended for months at a time for different reasons, such as being hacked, *id*., J-

17 to J-18, or due to "monthly limits on the exchanges" that prevented further

withdrawals, *id*. at J-12.

Cutting also enlisted his daughter to field and evade investor withdrawal

requests. As just one example, in response to one investor growing impatient with

CTM's failure to honor his withdrawal request, Lata stated:

> To accuse us of that is quite the insult. We've done nothing but
> hold to our word and we've done nothing but look to the best
> interest of our clients. I have emailed you twice since your last
> email.. once on the 13th and once on the 31st. You've taken out
> more money than you've put in so claiming a "rip off" is far
> from the truth. We have LEGAL laws that we have to follow to
> keep us and our clients protected. We have monthly limits on
> the exchanges (I emailed you about these as well). Please see
> the attached screen shot of our emails. We are also the one
> paying taxes on your money as well. So please do not snap and
> accuse for no reason. We have kept in contact and after over 2
> years we've only kept our clients happy.

*Id.*, Ex. J-12.  In another email responding to an inquiry regarding the status of the investor's withdrawal request, Lata explained, "[f]or the last 5 months we have had a severe hacker getting into our clients emails and using them to clean out their accounts….We've stopped 14 hacks of people withdrawing so far and before proceeding in EVERYONE's best interest were are investigating." *Id.* Ex. I-18.

CTM assured investors in that email that "[t]hese minor setbacks are completely normal and out of our control, but we will always solve the tasks at hand and we will continue to work extensively to resolve all matters" and promised to "continue to move forward to do safe, but aggressive trading and send out monthly spreadsheets as usual." *Weiland Decl.*, Ex. K-7. In the email, which purported to contain a "response in full transparency" to questions about delays in processing withdrawals, Cutting did not disclose the fact that as recently as March 31 the CTM accounts had almost no money or otherwise disclose a lack of funds as a reason for his inability to complete withdrawal requests. *Id.*

By August 2020, it appears that CTM completely stopped fulfilling requests by investors to withdraw their investment. *Knafo Decl.*, Ex. K-1. Even while many investors were told they could not withdraw their money, CTM fulfilled over 500 withdrawals requests from December 2017 to August 2020, most of which were rather small. *See generally Knafo Decl.*, Ex. L. Of the nearly $7 million of investor money CTM received, only $3.8 million has been paid to investors, leaving over

$3 million missing. *Knafo Decl.*, Ex. J-9 and Ex. L-14 to L-16. Most investors have a positive balance remaining with CTM. *See generally Knafo Decl.*, Ex. J.

> ### F. *Plaintiffs' Investments in the Crypto Fund*
> #### 1. *David Powell*

Among those who invested in the Crypto fund and who retain a significant positive balance with CTM are Plaintiffs David Powell and Merav Knafo. Powell invested his first $13,766.00 on November 4, 2018. Powell made this first investment based on "rapid returns" CTM and Cutting were reporting to Powell's friend in her monthly earning reports. *Powell Decl.* ¶¶ 2–3, Dkt. 171-3. In April and May 2019, Powell made two additional investments totaling $18,167.00 directly to Lata's personal PayPal account. *Id.* ¶ 3 & Exs. B, C. Powell made his last and largest investment of $500,000 on July 18, 2019, after receiving confirmation from Lata that CTM accepted deposits up to $5 million. *Id.* ¶ 3 & Ex. D. Prior to making this first investment, Powell had never had contact with Cutting nor Lata. *Id.* ¶ 2.

Powell testified that he invested in CTM based on the following "repeated representations" that: (1) "the Cutting Defendants were investing [his] money in altcoin and other digital-assets investments;" (2) [his] investment was growing rapidly; (3) "the Crypto Fund used advanced security measures to prevent loss of my investments;" and (3) "the money was being track in U.S. Dollars and could be

withdrawn." *Id.* ¶ 4. Powell further testified that he believed he had an agreement with CTM and Cutting and that he would be "contractually entitled to withdraw [his] investment principal and reported gains on request." *Id.* ¶ 6. Powell relied on these representations in deciding to deposit his money with CTM and Cutting. *Id.*

In August 2019, Powell began asking to withdraw from his account, and he did receive $10,000 that month. On September 14, 2019, Powell requested that CTM send a $20,000 every month and Cutting agreed. *Id.* ¶ 9.  Over the following months, Powell only received one $20,000 withdrawal.  In the spring of 2020, Powell began making larger withdrawal requests until finally, on May 16, 2020, he demanded that Cutting close his account and send his entire "active investment" at the time, which was represented to be $603,750.35, immediately. During this August 2019 to May 2020 timeframe, Cutting either ignored or evaded nearly all of Powell's entreaties to withdraw his funds. *Id.* ¶ 9 & Ex. H.

Powell's fourth and last investment, the $500,000 wire in July 2019, is the only investment of Powell's for which there is evidence showing what happened after he deposited it with CTM. Rather than investing the $500,000 in digital assets, as Powell believed he would, Cutting kept the money for his personal use. Chase Bank statements show Powell's wire arriving in CTM's Chase account on July 19, 2019. *Wieland Decl.*, Ex. O-44, Dkt. 171-7. Three days later, Cutting filled out a withdrawal slip transferring $300,000 to Golden Cross and withdrew

another $10,000 as cash. *Id.*, Ex. P. The $300,000 arrived in the Golden Cross

Glacier account the same day it was withdrawn from CTM's account. *Wieland*

*Decl.*, Ex. R-39. Shawn and Janine Cutting then used the money to again pay for

personal expenses like gas, carwashes, and groceries. *Id.*, R-39 to R-45. As for the

$190,000 remaining in CTM's Chase account, Cutting used it to pay multiple other

investors requesting withdrawals. *Id.*, Ex. O-44.

Yet, even as Powell unsuccessfully demanded his money back, Powell

continued receiving account statements showing that his investment was growing.

*Powell Decl.*, Ex. E at 15–22. The last statement Powell received on May 9, 2020,

showed an account balance of $603,750.35, a significant gain over the $531,933.00

total he invested. *Id.* at 21.  Powell also received the monthly Earning Updates and

newsletters assuring investors that the Crypto Fund was performing despite market

downturns and was being run competently with an admin team, auditors, and CPAs

on staff. *See generally Powell Decl.*, Ex. G. After accounting for the small

withdrawals he received, Powell's net out-of-pocket is $481,933.00 in lost

investment principal. *Powell Decl.* ¶ 10.

### 2.  Merav Knafo

The "brisk returns" Powell reported he was seeing through the monthly

reports also persuaded Knafo to make her initial investment of $4,745.94. *Knafo*

*Decl.* ¶ 2, Dkt. 171-4. Knafo testified she "went on to make additional investments

in reliance on representations made by Cutting Defendants," including the representations that her money was being invested in digital assets, was being track in US dollars, was growing rapidly, and could be withdrawn. *Id.* ¶ 3. Relying on the representations made in the monthly updates and newsletters, Knafo invested a total of $49,600.94 in Bitcoin and $42,116 in wire transfers from her Indonesian bank. *Id.*

No later than February 11, 2020, Knafo began requesting that her account be closed, and her money paid to her. *Id.* ¶ 9 & Ex. I. She testified that these requests "went essentially ignored," and she never recovered any of her investment. *Id.* On June 10, 2020, she had a lawyer sent a demand letter to Cutting via email. *Id.* Despite these attempts to withdraw funds, Knafo "has nothing to show" for her investment. *Id.* ¶ 13.

The final Earnings Update Knafo received was dated April 11, 2020, and showed her investment had purportedly grown to $119,375.94. *Id.* As for out-of-pocket losses, Knafo spent $109,716.90 to invest in the Crypto Fund, and she has received no withdrawals. *Id.* Her investment principal, net of transfer fees, amounted to $109,600.90.

## 2.    Procedural Background

Plaintiffs filed this action on July 15, 2020, alleging 14 claims for relief under federal and state law against CTM, Cutting, and Lata. Plaintiffs then filed a

First Amended Complaint on March 11, 2021, adding as defendants Cutting's wife, Janine Cutting, individually and as a trustee of Lake View Trust, Ash Development, LLC, Golden Cross Investments, LLC, Crypto Traders Fund, LP, and Lake View Trust, and a Second Amended Complaint on June 2, 2022, adding a prayer for punitive damages.

Prior to Plaintiffs' filing their Second Amended Complaint, counsel for Defendants Shawn Cutting, CTM, Janine Cutting, Golden Cross, and CTF moved to withdraw. This motion was conditionally granted, making defense counsel's withdrawal effective on June 10, 2022. Lata and Ash Development retained their own counsel. In addition, the Lake View Trust and Shawn and Janine Cutting, as trustees, also retained separate counsel.  CTM, Golden Cross Investments, and CTF were unable to retain new counsel, and default was entered against them on January 24, 2023.

On April 10, 2023, Plaintiffs filed the present motion. They seek summary judgment against Cutting and Lata and default judgment against CTM on their federal and state securities law claims (Counts 1-3), Idaho Consumer Protect Act ("ICPA") claim (Count 5), fraud claim (Count 6), and breach of contract claim (Count 7). In addition, Plaintiffs seeks summary judgment against Defendants Lake View Trust and Janine Cutting on their fraudulent transfer claim (Count X8) and seek default judgment against Defendant Golden Cross and CTF. Finally,

Plaintiffs also seek summary judgment on their prayer for punitive damages.

Defendants Shawn Cutting, Janine Cutting, and Lake View Trust, through counsel, filed a timely response to the pending motion. In the response, Shawn Cutting conceded no dispute of material fact exists as it relates to Plaintiffs' claims against him except to the extent that Plaintiffs seek punitive damages against him. Janine Cutting and Lake View opposed summary judgment against them on the fraudulent transfer claim. Lata filed a separate response opposing summary judgment against her.

Shortly after the pending motion was fully briefed, counsel for Defendants Shawn Cutting, Janine Cutting, and Lake View Trust moved to withdraw. On July 12, 2023, the Court held a status conference and granted the motion to withdraw. The Court also vacated the hearing on summary judgment set for August 17, 2023, until proof of service of the Order granting the motion to withdraw was filed and 21 days passed. Proof service was filed, and the hearing was reset for November 2, 2023. Shawn Cutting, Janine Cutting, and Lake View Trust did not retain new counsel.

At the November 2023 hearing, Shawn Cutting appeared on behalf of himself. Janine Cutting, however, did not. Lake View Trust, as an entity, also did not appear through counsel. The Court informed Cutting that his counsel, prior to withdrawing, had filed a response essentially conceding most of the claims filed by

Plaintiffs. Cutting stated he had never seen the response and not received anything filed in the case. He also claimed he has not received the order granting his prior counsel's motion to withdraw even though proof of service of the order had been filed. The Court therefore allowed Cutting to file a notice of appearance and an additional response to the motion for summary judgment.

On November 24, 2023, more than 21 days after the summary judgment hearing, Shawn Cutting and Janine Cutting, appearing *pro se*, filed a motion for extension of time to file a response to the pending motion for summary judgment. On November 24, 2023, the Cuttings also filed a motion requesting that the Court refrain from entering default judgment against them. Along with these filings, the Cutting filed hundreds of pages of exhibits.

With this motion for extension of time and to set aside default still pending, on January 22, 2024, Cutting filed a "Completed Declaration of Defendants Shawn & Janine Cutting in Support of Response to Plaintiffs' Motion for Summary Judgment (Dkt. 195) and "Completed Defendants Shawn and Janine Cutting's Dispute of Material Facts" (Dkt. 196). He also filed nearly a thousand pages of exhibits with the documents. Plaintiffs have not had an opportunity to respond to the declaration and additional exhibits.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any

claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims .. .." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." Id. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any material fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

Concurrently with this motion, Plaintiffs are renewing their motion for entry

of default against CTM, CTF, and Golden Cross. Upon entry of default, Rule 55

empowers this court to enter default judgment against those parties. Fed. R. Civ. P.

55(b)(2). "[D]efault does not entitle the non-defaulting party to a default judgment

as a matter of right." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 785 (9th Cir. 2011).

Rather, "[t]he district court's decision whether to enter a default judgment is a

discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

## ANALYSIS

### 1.  Motion for Extension of Time and to Set Aside Default

Shawn and Janine Cutting first ask the Court to extend the time to complete

their response to Plaintiffs' Motion for Summary Judgment, arguing that the "sheer

volume of work that needs to be done is overwhelming," such as searching,

researching, reviewing, saving, itemizing, and scan" over hundreds of thousands of

documents and print well over a thousands [sic] documents." *Mot. for Extension of

Time*, p. 4, Dkt. 188. They requested only "an additional 5 days to properly

complete and submit their motion." *Id.* With this motion, Cutting also submitted

730 pages of exhibits without any explanation.

In a separate filing titled "Setting Aside Default Judgment," the Cuttings

also ask the Court "to refrain from granting an order for Default Judgment."

*Setting Aside Default Judgment*, Dkts. 191&192. In this motion, the Cuttings

maintain that their former attorney failed to inform them of the pending motion for

summary judgment, and they were unaware that the Court had granted counsel's

motion to withdraw, even though counsel filed a proof of service showing that the order granting the motion to withdraw had been properly served on Shawn and Janine Cutting on July 30, 2023.

Addressing the Cuttings' second request first, the Court will refrain from entering default judgment against the Cuttings for a failure to appear within 21 days after the withdrawal order was served on July 30, 2023.  "Our starting point is the general rule that default judgments are ordinarily disfavored." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). "Cases should be decided upon their merits whenever reasonably possible." *Id.* Given this strong policy favoring decisions on the merits – and because the Cuttings has now appeared *pro se* – the Court will not enter default judgment against the Cuttings and instead will decide the summary judgment on the merits.

The Court, however, will deny the Cuttings' request to extend the time to complete their response to summary judgment and will not consider Cuttings' late-filed declaration in response to summary judgment and accompanying exhibits. First, the Court notes that the Cuttings only requested an additional five days, so even if the Court granted their motion, the declaration and exhibits were not filed until January 22, 2024 – nearly three months after the hearing on summary judgment, and two months after the Cuttings filed their motion to extend the deadline to respond. In other words, the declaration would be untimely regardless

of whether the motion was granted.

Second, it would be highly prejudicial to Plaintiffs to allow the Cuttings to file nearly a thousand pages of exhibits nine months after the summary judgment was filed. Not only are these filings untimely, but Plaintiffs have also not had an opportunity to respond to them. Given the already significant delays in this case caused by Defendants, it would be profoundly unfair to Plaintiffs to delay the decision on summary judgment further to give them an opportunity to respond to the new filings.

For these reasons, the Court will deny the Cuttings' request to extend the deadline for completing their response to summary judgment and will not consider the late-filed declaration and exhibits. *See, e.g., Sanders v. Trinity Servs. Grp. Inc*., No. 21-15333, 2024 WL 837045, at *1 (9th Cir. Feb. 28, 2024) (unpublished) (finding district court did not abuse discretion in not further extending the deadline to respond to defendants' summary judgment motions when court had already extended the deadline and plaintiff's response would have been untimely even if the court had extended the deadline as requested). The Court, however, will not hold Shawn Cutting to the concessions his former counsel made in responding to summary judgment and as stated above, will consider the merits of the motion.

**2.     Whether Investments in the Crypto Fund Are Securities Under Federal and State Law**

A complex patchwork of federal and state laws regulates the issuance and

sale of securities. These statutes include the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et seq. But these regulations apply only to investment products that qualify as securities under these statutes. For the purpose of federal law, as well as Idaho's Uniform Securities Act, a "security" is defined broadly to include any "investment contract." 15 U.S.C. § 77b(a)(1).

The Supreme Court has defined an "investment contract" as a "contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  The Ninth Circuit has "distilled *Howey's* definition into a three-part test requiring "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *S.E.C. v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (citation and internal quotation marks omitted). This analysis, which is commonly called the *Howey* test, may be applied to determine whether a given investment product qualifies as a security and is thereby subject to a number of federal and state regulations applicable only to covered securities.

As this Court held in the parallel SEC enforcement action, *S.E.C. v. Cutting, et al.*, Case No. 2:21-cv-103-BLW (the "SEC Case"), deposits in the Crypto Fund qualify as "investment contracts," and therefore qualified as a "security." *SEC*

*Case*, *Mem. Dec.*, Sep. 28, 2022, at 27–28, Dkt. 101 (citing *Howey*, 328 U.S. at 298-99 (defining "investment contract")).

**3.      Securities Fraud Under the Securities Exchange Act of 1934**

Plaintiffs first allege the that Cutting/CTM and Lata have violated the antifraud provisions found in Section 10 of the Securities Exchange Act of 1934 ("Exchange Act"), and the related Rule 10b–5.

"Section 10(b) of the [Exchange Act] makes it unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005) (quoting 15 U.S.C. §§ 78j, 78j(b)) (internal quotation marks, brackets, and ellipses omitted); *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 318 (2007).  Rule 10b–5, promulgated under § 10(b), in turn, makes it unlawful to (a) "employ any device, scheme, or artifice to defraud," (b) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," or (c) "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

A showing of scienter is required for a violation of Rule 10b-5. Scienter can be established by showing knowledge or recklessness. *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010).  Thus, the elements of a Rule 10b–5 claim are: "(1) a misrepresentation or omission of a material fact; (2) scienter; (3) causation; (4) reliance; and (5) damages." *Livid Holdings*, 416 F.3d at 946; *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

## A.      *Shawn Cutting/CTM*

### 1. *Materially False Statements*

A materially false or misleading statement violates Section 10(b) and Rule 10b-5. "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at the time." *Khoja*, 899 F.3d at 1008. "Even if a statement is not false, it may be misleading if it omits material information." *Id.* at 1008–09. "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (alteration in original) (quoting *Berson v. Applied Signal Tech.*, Inc., 527 F.3d 982, 985 (9th Cir. 2008)).

Plaintiffs here allege that Cutting and CTM made "at least three false

representations" to induce Plaintiffs to invest in the Crypto Fund. First, Cutting represented that Plaintiffs' deposits were being invested in a digital-asset portfolio. Second, Cutting represented to Plaintiffs, as well as other investors in the fund, that their investments were increasing rapidly, regardless of market conditions, as represented in the monthly Earnings Updates. Third, Cutting represented to both Powell and Knafo that they could withdraw their deposits at any time subject to minimal fees and time restrictions.

Cutting made these statements in welcome emails and receipts for deposits, the monthly Earning Updates showing steady, secure growth, and monthly newsletters, in which Cutting regularly assured investors that CTM was competently managing the investment fund, and the fund was growing. Cutting was also the "maker" of statements attributed to CTM because, as the owner and operator of CTM, Cutting had "ultimate authority over" each of these statements, "including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (To establish liability under Section 10(b) and Rule 10b-5(b) thereunder, the SEC must show that the defendant was the "maker" of the misstatements).

The evidence shows that each of these representations was false and misleading. First, Cutting's statements that he intended to use investor money to trade digital assets were false and misleading because, as the evidence shows, he

misappropriated invest funds and instead used those funds to cover personal expenses, such as purchasing groceries, sporting goods, clothing, gold, silver coins, meals, and home improvements, and to make Ponzi-like payments to previous investors.  Cutting has submitted no evidence indicating that he invested Plaintiffs' Bitcoin deposits in digital assets, as he represented, or even what he otherwise did with Plaintiffs' Bitcoin deposits. Similarly, no information has been provided regarding what happened to the two deposits Powell made into Courtney's PayPal account. As for Plaintiffs' wire deposits, as noted, the evidence shows these funds were spent on personal items, transferred to Golden Cross, or used to make Ponzi-like payment to other investors requesting withdrawals.

Second, Cutting's statements in the Earning Updates that Plaintiffs' investments were being used to trade digital assets and were earning specific returns each month were false and misleading because Cutting has submitted no evidence showing that he used Plaintiffs' deposits to trade digital assets or that their investments grew at the rates reflected in the Earning Updates. Cutting told investors that these Earning Updates were reviewed by auditors who did not exist.

Third, Cutting's statements in various emails and the monthly Earning Updates indicating that Plaintiffs could withdraw their deposits were false and misleading because, rather than honoring these withdrawal requests, Cutting refused or evaded Plaintiffs' withdrawal requests, with limited exceptions. At the

time, in July 2019, that Powell made his largest investment, and Knafo made her

first investment, Cutting and CTM had been evading other investors' withdrawal

requests for months, citing compliance efforts with "State and Federal laws,"

withdrawal limits from the digital asset trading platforms, theft, hacking, and the

closure of exchanges, among other reasons, *see, e.g., Weiland Decl.*, Ex. F-23, as

the basis for refusing to honor the requests. There is no evidence that any of those

representations were true.  Significantly, Cutting did not cite lack of funds as a

basis for denying the requests.

### 2. *Materiality*

Each of these statements was also material.  A misrepresentation is material

under Section 10(b) of the Securities Exchange Act and Rule 10b–5 "if there is a

substantial likelihood that a reasonable investor would have acted differently if the

misrepresentation had not been made or the truth had been disclosed." *Khoja*, 899

F.3d at 1009 (quoting *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d

940, 946 (9th Cir. 2005)) (internal quotation marks omitted). Both Powell and

Knafo have testified that they would not have invested in the Crypto Fund has they

known that their money would not be invested in a rapidly growing digital-asset

portfolio as represented in the Earning Updates or that their withdrawal requests

would not be honored. *Powell Decl.* ¶ 6; *Knafo Decl.* ¶ 6. Indeed, each statement

addresses matters that go directly to the profitability of Plaintiffs' investments and

were "so obviously important to the investor that reasonable minds cannot differ on the question of materiality." *SEC v. Riel*, 282 F. Supp. 3d 499, 520 (N.D.N.Y. 2017); *see also SEC v. Smart,* 678 F.3d 850, 857 (10th Cir. 2012) (the fact that defendants were not using money as represented would be material to a reasonable investor).

### 3.  Reasonable Reliance and Causation

Both Powell and Knafo also testified that they relied on representations Cutting made in the Earning Updates and newsletters to other investors and to themselves directly after they made their first investment.  Powell and Knafo had reason to doubt these representations that their investments were safe and growing as they had not made any withdrawal requests that were denied when they made their multiple investments. Thus, the undisputed facts show that Plaintiffs reasonably relied on Cutting's representations and omissions. *See, e.g., Goldman Sachs Grp., Inc.*, 141 S. Ct. 1951, 1958 (2021) ("The traditional (and most direct) way for a plaintiff to prove reliance is to show that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation.") (internal quotation marks omitted). In fact, both reliance and causation of injury may be "inferred from the proof and finding the materiality of materiality." *Koehler v. Pulvers*, 614 F. Supp. 829, 848 (S.D. Cal. 1985).

### 4. Scienter

To prove scienter, Plaintiffs must show that Cutting, with "a mental state embracing intent to deceive, manipulate, or defraud," *Tellabs*, 551 U.S. at 319 (citation omitted), made some material misrepresentation or omitted some material fact and so left a materially misleading impression on them. Scienter may be established through showing either actual knowledge or recklessness. *Gebhart v. SEC*, 595 F.3d 1034, 1040-42 (9th Cir. 2010).

Here, Cutting acted knowingly or recklessly when making the false and misleading statements and engaging in other deceptive conduct. As the sole owner of CTM, Cutting knew CTM's business, its investments, and use of investor funds. The evidence shows that Cutting knew he had taken investor deposits, including Powell's $500,000 deposit, and, contrary to his representations, never used it for trading and instead misappropriated a portion of the money to pay his personal expenses and make Ponzi-like payments to other investors.

Cutting claims in a late-filed declaration that Powell requested to buy Cutting's "personal PROC coins," and the "money from the sale was [his] to use as [he] saw fit," *Cutting Decl.* ¶ 23, Dkt. 195; but, other than this untimely, self-serving declaration, Cutting offers no proof for his assertion. If this really is what happened, Cutting could and should have provided documentation that this occurred. Yet he did not. While the Court must draw all *reasonable* inferences in

Cutting's favor, "inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn." *Itzhaki v. United States Liab. Ins. Co.*, 536 F. Supp. 3d 651, 654 (C.D. Cal. 2021) (citing *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

Even, however, if the Court were to accept Cutting's untimely and wholly unsupported assertion that he sold his personal digital assets to Powell, Cutting's use of Powell's funds to make Ponzi-like payments to other investors was inherently deceptive. *See, e.g., SEC v. Scoville*, 913 F.3d 1204, 24 (10th Cir. 2019) (finding scienter was established "by the fact that Defendants were operating a Ponzi scheme," which is "inherently deceptive because it generates a false appearance of profitability by using money from new investors to generate returns for earlier investors") (internal quotation marks omitted). Cutting would have known at the time Powell made that investment that the CTM Chase bank account had little to no money, and that he was not fulfilling investor withdrawal requests from their so-called "active investments" as represented in the monthly Earning Updates.

With respect to the monthly Earning Updates that he prepared and sent to Plaintiffs and other investors, the evidence also shows that Cutting knew or was reckless in not knowing that these updates contained false statements about gains,

earnings, and portfolio values. In fact, Cutting admits that the Earning Updates were rife with inaccuracies and chronic errors; he claims, however, that he only "discovered" the numerous errors in Earning Updates *after* this litigation was filed, and he performed a required accounting in the parallel SEC case. But Cutting's professed lack of knowledge regarding these "errors" in the Earning Updates does not jibe with the evidence.

First, Cutting falsely represented to investors that he had a team of auditors reviewing the Earning Updates on ongoing basis; this claim, which Cutting knew was false, reveals a clear intent to deceive investors about the accuracy and reliability of the updates. Second, according to Cutting, he somehow failed to "discover" the massive errors in the Earning Updates, which continued to reflect substantial gains, even when he was unable to repay some investors beginning as early as 2018. These facts demonstrate a deliberate avoidance of what Cutting knew his records showed.  At a minimum, they establish, a conscious recklessness as to the accuracy of the monthly Earning Updates. Given this evidence, Cutting requires more than his unsubstantiated and implausible assertion to the contrary to defeat summary judgment. *Itzhaki v. United States Liability Insurance Company*, 536 F. Supp. 3d 651, 654 (C.D. Cal. 2021) ("[T]he bald assertion that a genuine issue of material fact exists does not preclude summary judgment.").

Finally, the record further demonstrates that Cutting knew or was reckless in

not knowing that CTM would not honor all or most withdrawal requests when he represented to Plaintiffs that they could withdraw their investments. In July 2019, at the time when Powell made his largest investment, and Knafo made her first investment, Cutting and CTM had been evading other investors' withdrawal requests for months, citing compliance efforts with "State and Federal laws," withdrawal limits from the digital asset trading platforms, theft, hacking, and the closure of exchanges, among other reasons, *see, e.g., Weiland Decl.*, Ex. F-23, as the basis for refusing to honor the requests. Cutting did not cite lack of funds as a basis for denying the requests despite this being the real reason. In other words, Cutting knew many investors could not withdraw their funds despite their making repeated requests while representing to Plaintiffs at the very same time that they could withdraw their funds. These facts too establish Cutting's scienter.

Cutting engaged in this conduct – sending falsified Earning Updates and making Ponzi-like payments – to attract new investors, like Knafo, and additional investments from current investors, like Powell, and also to persuade existing investors to leave their money with Cutting and refrain from seeking to withdraw their funds. As this Court found in the parallel SEC case, this "lulling conduct" intended to prevent investors from discovering the fraud, which continued well after Cutting completely stopped fulfilling investors' redemption requests, is further strong evidence of Cutting's scienter. *SEC Case,* Dkt. 101 at 33 (citing *SEC*

*v. Wang*, No. LA CV13-07553 JAK (SSx), 2015 WL 12656906, *17 (C.D. Cal.,

Aug. 18, 2015)); *see also Scoville*, 913 F.3d at 24. As the Ninth Circuit has

explained, evidence of "activities tending to lull investors, either to prevent

discovery of fraud or to permit further fraudulent activities to progress unhindered,

have been held to constitute a part of the execution of the fraudulent scheme and to

be integral to the offense rather than incidental to it." *United States v. Brown*, 578

F.2d 1280, 1285 (9th Cir. 1978).

 The Court therefore finds no dispute of material fact that Cutting/CTM acted

with the requisite scienter.

### B. Courtney Lata

 Lata, on the other hand, has presented credible evidence to create an issue of

material fact on whether she possessed the requisite scienter. Lata argues that

summary judgment is improper because she "did not possess the requisite

scienter." *See Lata Response* at 3, Dkt. 173. Although Lata's unequivocal

statement reaches too far at this stage, the Court agrees that material issues exist

regarding Lata's mindset rendering summary judgment improper.

 Plaintiffs maintain that the evidence shows that Lata possessed the requisite

scienter because she was "intimately involved with the day-to-day operations of

the Crypto Fund from at least late 2017 to mid-2019," and she and Cutting

"represented that, together, they "[ran] CTM and ha[d] from the beginning." *Pl's*

*Br.*, p. 8, Dkt. 171-2.  Lata also posted on Facebook in December 2018 and again in June 2019 that she and Cutting were "business partners." Plaintiffs also claim that Lata "knew" that "there was no crypto portfolio and, therefore, no 'gains' to report," and that she further "knew at least some investor funds were not going to CTM," as she received two deposits from Powell into her personal PayPal account and told another investor that he could deposit directly into the Gold Cross Investments bank account rather than depositing with CTM.

Plaintiffs further allege that Lata knew that the gains reported in the CTM software were numbers manually inputted by Cutting or herself and that she "also told investors all sorts of things she knew were false to evade withdrawal requests." *Id.* at p. 10.  The lies Plaintiffs say Lata told included "suggesting that CTM had a competent legal team, that CTM had an 'admin team,' that regulations prevented withdrawal requests, that CTM was subject to 'withdrawal limits,' that investors were suffering losses despite monthly statements to the contrary, and that withdrawals were suspended due to hackers." *Id.*  They also say Lata "cajoled investors to keep their money with CTM and to invest more," by, for example, telling one investor the "market will bounce back" and it was "an absolutely wonderful time to be buying in all of the lows of the market." *Id.* Plaintiffs provide other examples of Lata's "cajoling" of investors.

Lata disputes these allegations. At the time Lata began helping her father,

Shawn Cutting, with CTM, she was 19 years' old. She stopped helping her father when she was 20 years' old. Prior to helping her father, Lata managed a restaurant during high school and then a local coffee shop after graduation. She submitted a declaration stating that she was not involved with CTM from the beginning and had never run the company. *Lata Decl.* ¶ 16. She says she would help her father "by entering basic investor identifying information into the program," *id.* ¶ 20, and by responding to emails using her father's email account, *id.* ¶ 25. According to Lata, her father would tell her what to write in these emails, or she would send out emails "pre-drafted" by her father, including the emails she sent in response to investor withdrawal requests. *Id.* ¶¶ 25-26.  To Lata's knowledge, her father calculated the gains and losses and inputted them into the software with the help of Mike Priest and Marc Dixon. *Id.* ¶ 22. She had nothing to do with this.

As for her PayPal account, Lata admits she set up the account, but she says that the email associated with the account was not her email. *Id.* ¶ 29. She maintains that the funds deposited by investors were then all transferred into her father's accounts, as he directed, and that she believed those funds would be used as her father "described to [her]self and many others, as investment in cryptocurrency for the investors." *Id.* Lata saw her father trading, as well as "snapshots he took of millions as a balance in his trading platforms" and "screenshots of trades…in his photos and on his office walls." *Id.* ¶ 32.  Cutting

would also tell Lata that he consulted with attorneys and accountants about the Crypto Fund. Lata trusted her father and believed he was a successful crypto trader.

Lata's declaration creates an issue of fact regarding her scienter and whether she was the "maker" of any misrepresentations. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (To establish liability under Section 10(b) and Rule 10b-5(b) thereunder, the SEC must show that the defendant was the "maker" of the misstatements). Lata has presented credible evidence that she had no control over the business and that she acted on a reasonable, good-faith belief that her father operated a legitimate crypto-trading business. In light of Lata's testimony, a reasonable jury could find that she did not act with the sort of "deliberate recklessness" the Ninth Circuit requires to show scienter. *See, e.g., Nat'l Elevator Industry Pension Fund v. VeriFone Holdings, Inc. (In re VeriFone Holdings, Inc. Sec. Litig.)*, 704 F.3d 694, 702 (9th Cir. 2012) (explaining that scienter requires a showing of, at a minimum, deliberate recklessness, and facts showing "mere reckless or a motive to commit fraud" do not suffice).

Plaintiffs argue the Court should disregard Lata's declaration testimony because "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion

for summary judgment. *Plf.s' Reply* at 2, Dkt. 171 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). In *Scott*, however, the respondent's version of events was "so utterly discredited" by a videotape of the contested conduct "that no reasonable jury could have believed him." *Scott,* 550 U.S. at 380. In this case, by contrast, there is no irrefutable evidence, like a videotape, that directly contradicts Lata's version of events. She says her father told her – his daughter barely out of high school – what to say and do and that she believed and trusted him. "When things are in such a posture, courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the summary judgment motion." *Scott*, 550 U.S. at 378.

Viewing the facts and drawing all reasonable inferences in Lata's favor, therefore, the Court finds that Lata has presented issues of material facts rendering summary judgment improper.

### 4.    Sale of Unregistered Securities

Plaintiffs also allege that Cutting and Lata violated Sections 5(a) and (c) of the Securities Act by selling unregistered securities. Sections 5(a) and (c) of the Securities Act "make it unlawful to offer or sell a security in interstate commerce if a registration statement has not been filed as to that security, unless the transaction qualifies for an exemption from registration." *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1085 (9th Cir. 2010) *S.E.C. v. Phan*, 500 F.3d 895, 901 (9th

Cir. 2007) (citing 15 U.S.C. § 77e(a)).

To establish a *prima facie* violation of Sections 5(a) and (c), Plaintiffs need only show that: (1) the defendants, directly or indirectly, offered or sold securities; (2) no registration statement was in effect or filed with the SEC for the offer or sale of those securities; and (3) interstate means were used in connection with the offer or sale. *See* 15 U.S.C. §§ 77e(a) and (c); *Phan*, 500 F.3d at 902. Scienter is not an element of Section 5. *Aaron v. SEC*, 446 U.S. 680, 714 (1980).

"Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *Platforms Wireless*, 617 F.3d at 1086 (quoting *SEC v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980)). "Exemptions from registration provisions are construed narrowly in order to further the purpose of the Act: To provide full and fair disclosure of the character of the securities, and to prevent frauds in the sale thereof." *Id.* (citation and internal quotation marks omitted).

### A.    *Shawn Cutting/CTM*

Plaintiffs have established a *prima facie* case that Cutting violated Section 5 of the Exchange Act. The first and the third elements are satisfied by the evidence described above: the pooled CTM investments are securities because they are "investment contracts" under *Howey*, and Cutting used emails and the internet in connection with the offer and sale of the pooled CTM investments. The second

element is established because there was no registration statement in effect or filed with the SEC for the offer or sale of the pooled CTM investments. Plaintiffs have thus established a *prima facie* case that Cutting violated Sections 5(a) and (c) of the Securities Act.

As Plaintiffs have introduced evidence that Cutting has violated the registration provisions, Cutting now bears the burden of showing entitlement to an exemption. *See, e.g., Platforms Wireless*, 617 F.3d at 1085. Cutting fails to meet this burden. At various point in this litigation, Cutting has submitted declarations stating that he hired a law firm to file a "Form D" and for that reason he believed CTM would be exempt from the registration requirement. This argument fails because Cutting's misunderstanding about the Form D has nothing to do with whether he violated Section 5 because scienter is not an element of Section 5 violations, *Aaron*, 446 U.S. at 714 (1980), and has nothing to do with Cutting's ability to establish an exemption, *Chanana's Corp. v. Gilmore*, 539 F. Supp. 2d 1299, 1304 (W.D. Wash. 2003) ("Rather than removing the exemption, the consequence of failing to file a Form D is disqualification from making future offerings under the rules.") (citing Rule 507 at 17 C.F.R. § 230.507).

In his late-filed declaration, Cutting also asserts that he did not directly solicit investments. As the Court made clear in the *SEC case*, the Court declines to "examine the different exemptions and comb through the record to ascertain

whether Cutting could establish one." *SEC Case*, Dkt. 101 at 39. "And, in any event, the evidence demonstrates that [Cutting] both directly and indirectly solicit[ed] investments [to the public]  by operating a website inviting anyone to deposit money and digital assets without any limit to the investment opportunity, sending out emails touting his qualifications and trading experience, sending monthly Earning Updates, which included a link to make additional deposits, and by having existing investors solicit investors to whom he paid commissions." *Id.* Accordingly, Cutting and CTM are liable under Section 5 to Powell for $481,933 and to Knafo for $109,600.90 in unreturned investment principal, plus interest.

### B.    Lata

With regard to Lata, on the other hand, genuine issues of material facts exist regarding whether Lata sold or offered to sell securities to Powell.

Although Section 5 provides that it is unlawful for any person to sell or offer to sell an unregistered security, liability under Section 5 "is not confined to the person who passes title to the security." *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980). Rather, liability for violations of Section 5 extends to those who have "engaged in steps necessary to the distribution of [unregistered] security issues." *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir.1941); s*ee also Murphy*, 626 F.2d at 650–51 (9th Cir. 1980). "With respect to Section 5, a defendant's role in the transaction must be a significant one before liability will

attach." *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013) (quoting *Murphy*, 626 F.2d at 648) (internal quotation marks omitted). "Defendants play a significant role when they are both a 'necessary participant' and 'substantial factor' in the sales transaction." *Id.* (quoting *Phan*, 500 F.3d at 906) (internal quotation marks omitted).

"Because Section 5 imposes strict liability for violations of its registration requirement, the Ninth Circuit has recognized "that it is particularly important that the necessary participant and substantial factor test be carefully applied to each case so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict liability." *S.E.C. v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 (9th Cir. 2013). A defendant is a necessary participant when the sales transaction would not have taken place but for that defendant's participation. *Murphy*, 626 F.2d at 651. In addition to being a necessary participant, a defendant "must also be a substantial factor in bringing about the transaction." *CMKM Diamonds*, 729 F.3d at 1255 (citing and quoting *Murphy*, 626 F.2d at 650). "[W]hether a defendant is a substantial factor in the distribution of unregistered securities is a question of fact requiring a case-by-case analysis of the nature of the securities scheme and the defendant's participation in it. *Id.* at 1258 (citation omitted).

But this does not mean that summary judgment on this issue is never

appropriate. *Id.* In *Murphy*, for example, the Ninth Circuit "affirmed the district court's grant of summary judgment in the SEC's favor regarding the defendant's Section 5 liability "because Murphy participated heavily in the offerings." *Id.* (quoting *Murphy*, 626 F.2d at 638, 652). "He devised the corporate financing scheme for [the issuer].... He prepared and reviewed offering memoranda; he met personally with broker-dealers, investors and their representatives; and he spoke at broker-dealer sales seminars." *Murphy*, 626 F.2d at 638, 652. "There can be no gainsaying the importance of these acts," the Ninth Circuit explained: "Murphy's extensive role in facilitating the transactions clearly was a substantial factor in the sales of unregistered securities." *Id.*

Similarly, in *Phan*, the Ninth Circuit "affirmed summary judgment holding the defendant liable under Section 5 where the defendant chose the date to call in the investor's $1.25 million obligation to the issuer, directed the investor to sell the shares in order to repay her obligation, provided the investor with a buyer, directed the issuer's lawyer to draft a contract for the stock sale, and instructed the investor where to send the proceeds." *Id.* (citing *Phan,* 500 F.3d at 906). These facts led the Ninth Circuit to conclude that Phan was "both a 'necessary participant' and a 'substantial factor in' Wu's resale." *Id. See also S.E.C. v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) (finding the undisputed facts "amply" supported the district court's determination that, as a matter of law, the defendant, Calvo, "illegally sold

unregistered securities).

In this case, by contrast, the undisputed facts do not establish as a matter of law that Lata was a substantial participant in soliciting investments from Powell and Knafo. She was not the sole owner of CTM – or even a paid employee of CTM. *Compare S.E.C. v. Alpha Telcom, Inc.*, 187 F. Supp. 2d 1250, 1260 (D. Or. 2002), *aff'd sub nom. S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003) ("As the sole owner of Alpha, Rubera's involvement in the payphone program is sufficient to create liability" as a participant in the offering of unregistered securities). Similarly, it is disputed whether Lata "participated heavily in the offerings." *Murphy*, 626 F.2d at 638, 652). Unlike in *Murphy*, there is no evidence that Lata devised, or even helped to devise, the fraudulent scheme, or that she prepared any official documents related to CTM, such as offering memoranda, or that she met personally with broker-dealers or investors. *Compare id.*

Instead, according to Lata, she just helped her dad answer some emails "a few hours a week," without pay, and he would tell her how to respond or would pre-draft them for her. *Lata Decl.* ¶¶ 17, 25. She maintains she "did not independently respond to emails because [she] did not have the authority to do so." *Id.* ¶ 25. From submitted evidence, a reasonable jury could find that Lata merely served as a conduit of information and did not actively solicit investments from Powell. Moreover, there is no evidence that Lata solicited any evidence from

Knafo, and Plaintiffs do not argue otherwise.

In short, "[t]his case does not present evidence of [Lata's] significant and continuing involvement in the development and execution of a scheme to distribute securities in violation of the Securities Act like that which has supported the entry of summary judgment in other cases on the question of whether defendants were a substantial factor in a securities distribution." *CMKM Diamonds*, 729 F.3d at 1259. Summary judgment against Lata on this issue is therefore not appropriate. *Id.*

**5.    State Law Claims Against Cutting, CTM, and Lata**

   ***A.    Idaho Securities Fraud Act***

Similar to Section 10(b) of the Exchange Act, Idaho Code Section 30-14-501 states that in connection with the sale of a security, it is unlawful to:

> (1) To employ a device, scheme, or artifice to defraud;
>
> (2) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;
>
> (3) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person; or
>
> (4) To divert investor money to the personal use of the issuer, offeror or seller, or to pay prior investors without specifically disclosing that use before receiving the investor's money.

I.C. § 30-14-501.

 Idaho Code § 30–14–509 provides for civil liability of a seller for selling in violation of Idaho Code § 30–14–501. *See also Mannos v. Moss*, 155 P.3d 1166,

1172 (Idaho 2007) "This Court has attempted to maintain uniformity and continuity with the Federal Securities Act and has utilized federal law in interpreting the Idaho Securities Act." *Meyers v. Lott*, 993 P.2d 609, 613 (2000) (citing to *Frachiseur v. Mountain View Irrigation Company, Inc.*, 100 Idaho 336, 597 P.2d 222 (1979)).

Plaintiffs' arguments under this claim mirror their arguments relating to Section 10(b) of the Exchange Act with respect to Cutting and Lata's direct liability. Therefore, for all the reasons that the Court granted summary judgment against Cutting and denied summary judgment against Lata on the Section 10(b) claim, the Court will grant summary judgment against Cutting and deny summary judgment against Lata under the Idaho Securities Act.

Genuine issues of material fact also exist with respect to whether Lata is jointly liable as an aider and abettor. "An individual who is an employee of or associated with a [control person liable for fraud] and who materially aids the conduct giving rise to the liability" is jointly and severally liable unless that individual carries the burden of proof that he or she did not know, and could not reasonably have known, about the fraudulent conduct. I.C. § 30-14-509(g)(3). While the Court views this as a very close question regarding whether Lata "could have reasonably known" of the fraudulently scheme, "when plaintiffs' proof is viewed against [Lata's] relative youth and inexperience, [she] is entitled to the

benefit of the doubt" for purposes of summary judgment. *Koehler v. Pulvers*, 614

F. Supp. 829, 848 (S.D. Cal. 1985). Again, therefore, for all the reasons already

stated, the Court cannot find as a matter of law that Lata knew or reasonably could

have known about the fraudulent conduct.

### B.    *Violation of the Idaho Consumer Protection Act (ICPA).*

"The ICPA is remedial legislation intended to deter unfair and deceptive

trade practices and is to be construed liberally." *Roost Project, LLC v. Andersen*

*Constr. Co.*, 437 F. Supp. 3d 808, 827 (D. Idaho 2020); *see also Duspiva v.*

*Fillmore*, 293 P.3d 651, 656 (Idaho 2013) (quoting I.C. § 48–601).  "Acts or

practices declared unlawful by the ICPA include engaging in any act or practice

which is otherwise misleading, false, or deceptive to the consumer." *Tricore Invs.,*

*LLC v. Est. of Warren through Warren*, 485 P.3d 92, 114 (Idaho 2021) (quoting

I.C. § 48-603(17)) (internal quotation marks and brackets omitted). "Proof of

intention to deceive is not required for finding that an act is unfair or deceptive."

*Id.* (quoting *Duspiva*, 293 P.3d at 656) (internal quotation marks and brackets

omitted). But "the offending party must be a person who 'knows, or in the exercise

of due care should know, that he has in the past, or is' committing an act or

practice declared unlawful by Idaho Code section 48-603." *Swafford v. Huntsman*

*Springs, Inc.*, 409 P.3d 789, 793 (Idaho 2017) (quoting I.C. § 48-603). Further,

"claims brought under the ICPA must be based on a contractual relationship."

*Tricore*, 485 P.3d at 114 (quoting *Doble v. Interstate Amusements, Inc.*, 372 P.3d 362, 364 (Idaho 2016)).

All the reasons already recounted alternatively support liability against Cutting under the ICPA. With respect to Lata, however, issues of fact exist with respect to whether knew or should have known that she was engaging in unfair or deceptive acts. Moreover, Plaintiffs have not established that a contractual relationship existed between them and Lata. In fact, this Court previously ruled that no contractual relationship existed between Plaintiffs and Lata. *Mem. Dec., Feb. 4, 2021*, p. 5, Dkt. 40. Dismissal of the ICPA claim against Lata is therefore appropriate. *See Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010) (dismissing plaintiffs' ICPA claim because they were not in a contractual relationship with the defendant).

### C.    Fraud

Under Idaho common law, a plaintiff must prove the following elements to succeed with a fraud claim: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. *G & M Farms v. Funk Irrigation Co.*, 808 P.2d 851, 855 (Idaho 1991).

Plaintiffs again repeat their arguments relating to Section 10(b) of the Exchange Act and the ICPA with respect to Cutting and Lata's liability for common-law fraud. Therefore, for all the reasons that the Court granted summary judgment against Cutting and denied summary judgment against Lata on the Section 10(b) claim, the Court will grant summary judgment against Cutting and deny summary judgment against Lata on Plaintiffs' fraud claim.

### D.   *Breach of Contract*

"The elements for a claim for breach of contract are: (a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Mosell Equities, LLC v. Berryhill & Co.*, 297 P.3d 232, 241 (2013). A contract may be express or implied. *See, e.g., Continental Forest Products, Inc. v. Chandler Supply Co.*, 518 P.2d 1201, 1205 (Idaho 1974). "Express contracts exist where the parties expressly agree regarding a transaction." *Id*. "An implied-in-fact contract exists where there is no express agreement, but the conduct of the parties implies an agreement from which an obligation in contract exists." *Clayson v. Zebe*, 280 P.3d 731, 736 (Idaho 2012) (citation, internal quotation marks, and brackets omitted).

In granting a Writ of Attachment to Plaintiffs, this Court concluded that Defendants Cutting and CTM are liable to Plaintiffs for breach of contract. *Mem. Dec., Feb. 4, 2021*, pp. 4, Dkt. 40. Neither Cutting nor CTM have presented any

evidence to cast doubt on that ruling. Accordingly, the Court will grant summary

judgment against Cutting and CTM for breach of contract.

## 6.   Damages Against CTM and Cutting

Although Plaintiffs have established that they are entitled to summary

judgment against CTM and Cutting on various claims, they cannot obtain a double

(or sextuple) recovery for the same harm. *See Teutscher v. Woodson*, 835 F.3d 936,

954 (9th Cir. 2016) (explaining the doctrine against double recovery dictates that

"a plaintiff can recover no more than the loss actually suffered") (citation and

internal quotation marks omitted). "The animating principle is simple: when a

plaintiff seeks compensation for wrongs committed against him, he should be

made whole for his injuries, not enriched." *Id.* (citation and internal quotation

marks omitted).

Yet Plaintiffs seek damages on each of their claims. To avoid a duplicative

recovery, Plaintiffs shall submit a summary outlining the total amount of damages

they seek against CTM and Cutting, the legal basis for that amount, and the

amount of the damages for which they would be entitled to prejudgment interest,

within 14 days of entry of this order.

With regard to punitive damages, the Court finds the facts support an award

of punitive damages against Cutting and CTM but not Lata. With their separate

submission to the Court relating to compensatory damages, Plaintiffs shall also

detail the precise amount of punitive damages they seek against Cutting and CTM and the basis for it.

**7.    Fraudulent Conveyance Claim Against Golden Cross, Lake View Trust, and Janine Cutting**

Plaintiffs seek to recover from Defendants Lake View Trust, Golden Cross, and Janine Cutting, transfers made to them by CTM, Cutting, and Lata on the grounds that the transactions are voidable fraudulent transfers under the Idaho's Uniform Voidable Transaction Act, I.C. §§ 55-910, *et seq*. Under the Act, transfers made with actual intent to hinder, delay, or defraud a creditor, whether past or future, are voidable. I.C. § 55-913(1)(a). Transfers are also voidable by past and future creditors if the debtor made the transfer without receiving reasonably equivalent value when or shortly before the debtor was about to engage in activities for which the debtor lacked reasonably sufficient assets. I.C. § 55-913(1)(b).

If a creditor establishes that a fraudulent transfer was made, the Act provides remedies including avoidance, attachment, injunction, receivership, and other relief. I.C. § 55-916(1). To the extent the transfer is voidable, the creditor may recover a money judgment for the lesser of the value of the asset transferred and the amount necessary to satisfy the creditor's claim. I.C. § 55-917(2). The judgment can be entered against the first transferee of the asset or the person for whose benefit the transfer was made. I.C. § 55-917(2)(a).

Here, Plaintiffs, as creditors of Cutting and CTM, seek a judgment against first transferees, Golden Cross, Lake View Trust, and Janine Cutting, in the value of the transferred funds. In applying section 55-913, the Court considers whether Plaintiffs have established (1) CTM, Cutting, Lata were indebted to them, (2) Plaintiffs' claim arose before or after the allegedly fraudulent transfers were made, (3) CTM, Cutting, and Lata made the transfers with the actual intent to hinder, delay, or defraud, and (4) the total amount each of the transferees received from CTM, Cutting, Lata. *See Clarke v. Latimer*, 437 P.3d 1, 5 (2018). Section 55-913 sets forth the various factors a court may consider in determining actual intent, including whether transfer or obligation was to an insider, I.C. § 55-913(2)(a), whether the debtor retained possession or control of the property transferred after the transfer, I.C. § 55-913(2)(b), and whether value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, I.C. § 55-913(2)(h).

### A. Golden Cross

With respect to Golden Cross, Plaintiff allege that Cutting/CTM deposited investor funds into the Golden Cross bank account totaling no less than $812,789.02. In addition, Cutting moved $300,000.00 of Powell's $500,000.00 investment from the CTM's Chase account to the Golden Cross Glacier account. As default has already been entered against Golden Cross, and it has filed no

response to Plaintiffs' motion, the Court finds that Plaintiffs have established such transfers by CTM/Cutting, which total $1,112,789.02, are voidable as a fraudulent transfer. Judgment is therefore entered against Golden Cross equal to Plaintiffs' other claims up to $1,112,789.02

As the amount exceeds any amounts recoverable by Plaintiffs, it is not necessary for the Court to determine whether the amounts transferred by Lata qualify as a fraudulent transfer. In any event, the Court finds issues of fact exist regarding whether Lata made any of the transfers with the actual intent to defraud, hinder, or delay CTM's creditors.

### B. Lake View Trust

Citing Idaho Code section 55-905, Plaintiff claims "Idaho law allows a creditor to avoid transfers in trust 'for the use of the person making the same' regardless of intent to defraud." *Pls' Br.*, p. 24, Dkt. 171-2.  Section 55-905 only applies to fraudulent transfers of "personalty," which includes "goods, chattels, or things in action." I.C. § 55-905. Yet Plaintiffs maintain that "[j]udgment should be entered against the Trust equal to the amount awarded on Plaintiffs' other claims up to $901,762.73, representing: (a) cash deposits of $108,562.73; (b) transfers from Golden Cross of $373,200.00; (c) Shawn deposit of $210,000.00; and (d) Courtney deposit of $210,000.00." *Pls' Br.*, p. 24, Dkt. 171-2. As Plaintiffs fail to establish any of these transfers qualify as "personalty," Plaintiffs' reliance on

section 55-905 is misplaced, and Plaintiffs otherwise have failed to specify the bases on which each of these transfers is voidable.

With respect to the transfer to Lake View Trust from Golden Cross, specifically, Plaintiffs have not established that they were creditors of Golden Cross and that they had an interest in the funds that were transferred by Golden Cross to Lake View Trust. *See, e.g., ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008) (explaining for plaintiffs to prevail on fraudulent transfer claim, they must establish the existence of an actual creditor with a viable cause of action against the debtor, and that they had an interest in the transferred assets). Moreover, through this decision, Plaintiffs have obtained a judgment directly against Golden Cross, and they fail to show that the transfer Lake View Trust received from Golden Cross is not duplicative of this other recovery from Golden Cross. As plaintiffs seeking summary judgment against a defendant, Plaintiffs carry a heavy burden, and they have not met that burden on this claim. Summary judgment against Lake View Trust is therefore denied.

### C.    *Janine Cutting*

Plaintiffs argue that the following transactions constitute voidable fraudulent transfers: (a) Janine Cutting received $34,012.09 in cash by using her debit card drawn on CTM's bank account; (b) Janine and Shawn Cutting received a net of $79,625.00 transferred from the Golden Cross account to their personal joint

checking; and (c) Janine Cutting received the Bing Haven Estates parcel, which was purchased for her by Shawn Cutting for $50,000. Defendants do not dispute that all of this happened at a time when those various Defendants owed large liabilities to Plaintiffs.

Plaintiffs have therefore established that the $34,012.09 in cash Janine Cutting received from the CTM bank account and the Bing Haven Estates parcel. Plaintiffs, however, have failed to establish they may obtain a judgment against Janine Cutting for the amount of the transfer made by Golden Cross to her for the same reasons articulated with respect to the transfer from Golden Cross to the Lake View Trust.

## 8.    Conclusion

In sum, the Court will grant Plaintiffs' motion for summary judgment and default judgment against Cutting and CTM in its entirety and will deny the motion as it pertains to Lata in its entirety. As Plaintiffs may not obtain duplicative recoveries against Cutting and CTM for the same harm, Plaintiffs must submit a summary of the total damages they seek, the basis for these damages, and the amount of damages for which they are entitled to prejudgment interest, and the legal basis for those damages.

## ORDER

### IT IS ORDERED that:

1.    Plaintiffs' Motion for Summary Judgment and for Default

Judgment (Dkt. 171) is **GRANTED in part and DENIED in part**, **as set forth herein.** Plaintiffs are directed to submit a summary of the total damages they seek, the basis for these damages, and the amount of damages to which they are entitled to prejudgment interest, and the legal basis for those damages *within 14 days of entry of this Order.*

2.      Defendants Shawn Cutting and Janine Cutting's Motion for Extension of Time (Dkt. 188)  is **DENIED**.

DATED: March 28, 2024

B. Lynn Winmill
U.S. District Court Judge